STATE of Utah, Plaintiff and Appellee,

v.

Herbert C. WHITE, Defendant
and Appellant.

No. 920194–CA.

Court of Appeals of Utah.

June 23, 1993.

---

**657**

Lisa J. Remal and Ronald S. Fujino, Salt Lake City, for defendant and appellant.

R. Paul Van Dam and Joanne C. Slotnik, Salt Lake City, for plaintiff and appellee.

Before GARFF, GREENWOOD and ORME, JJ.

GREENWOOD, Judge:

Defendant Herbert C. White appeals his conviction for attempted unlawful possession of a controlled substance, a class A misdemeanor, in violation of Utah Code Ann. § 58–37–8(2)(a)(i), –8(2)(b)(ii), and –8(7) (Supp.1992), on the ground that the trial court convicted him based on erroneously admitted evidence. On appeal defendant claims that (1) the police officer exceeded the scope of a lawful frisk because he had no reasonable belief that he or anyone else was in danger; and (2) the court erred in not suppressing certain evidence as fruits of a search rendered unlawful by defendant's inadmissible statement. Because we find the police officer lacked justification for the frisk at its inception, the evidence discovered as a result of the frisk was inadmissible. We, therefore, reverse defendant's conviction and remand.

## BACKGROUND

"Because a determination of the reasonableness of police conduct is highly factual in nature, we review the facts in detail." State v. Trujillo, 739 P.2d 85, 86 (Utah App.1987). On November 4, 1991, a woman identifying herself as Charlene White, defendant's former wife, telephoned the Midvale City Police Department from the Westridge Club at 7642 South State Street. She spoke with Captain Pherson and made the following allegations concerning defendant: (1) He was in the Westridge Club parking lot in the back seat of a brown 1977 Oldsmobile; (2) he was accompanied by another woman; (3) he was on parole for armed robbery; (4) he was violating his parole by using cocaine, and at the time of the call he was high on cocaine; and (5) he had been involved in a domestic disturbance at a different location earlier that same day. The captain communicated this information to Officer Yurgelon, who later testified at the suppression hearing about the ensuing encounter.

Because information passed on to Officer Yurgelon referred to both cocaine use and a domestic disturbance, he requested three back up officers to accompany him when he responded to Ms. White's call. Upon arrival at the Westridge Club, two detectives confirmed the presence of the brown 1977 Oldsmobile in the parking lot and noted that it was occupied by a man and a woman leaning over in the back seat. Officer Yurgelon, accompanied by the other officers, drove up behind the Oldsmobile in two marked police cars and one unmarked police car. Accompanied by another officer, Officer Yurgelon approached the car and asked the parties to step out of the vehicle. While a second officer questioned the passenger, Ms. Cammer, Officer Yurgelon focused on defendant, instructing him to keep his hands in sight, out in front of him and then to place his hands on the back portion of the car. Officer Yurgelon then proceeded to frisk defendant for weapons.

Officer Yurgelon testified that he had stopped defendant and requested him to exit the car because of his suspicion that defendant had violated his parole and had possibly been involved in a domestic disturbance. He conceded, however, that observation of defendant while in the vehicle and while exiting it gave "no indication that [defendant] was armed." Officer Yurgelon saw no gun, knife, or similar weapon. He also noted that defendant was "mellow" and cooperative. However, because Officer Yurgelon was concerned that defendant's heavy coat could be concealing weapons, he frisked defendant.

During the course of the pat down, the officer questioned defendant about a hard, horseshoe shaped object he had felt in defendant's coat pocket. Although the object turned out to be a set of false teeth[1], defendant responded, "It's my outfit." Officer Yurgelon interpreted the word "outfit" as vernacular for drug paraphernalia, defining an "outfit" as "a little spoon they might cook their dope up in and a little needle or syringes, etc." Officer Yurgelon then asked defendant, without first administering a *Miranda* warning, if he had any needles on him, and defendant answered that he had a capped needle in his pants pocket. When Officer Yurgelon pulled out the indicated pocket, he saw a syringe and a small plastic, aspirin-type container. After retrieving these items from defendant's pocket, the officer handcuffed defendant, put him in the patrol car, and told him that he was under arrest for probable parole violation and possession of drug paraphernalia. Tests later showed that the aspirin box contained residue from a controlled substance.

At a suppression hearing on February 28, 1992, defendant moved to suppress all unlawfully obtained evidence and statements. He argued that the weapons search was unreasonable because the officers articulated no legitimate basis for believing that he was dangerous. He noted that the officers neglected to verify the

alleged incident of domestic disturbance, and that defendant's behavior contradicted any suggestion in the initial complaint that defendant was high on cocaine. Defendant also claimed that because the trial court had earlier ruled that defendant's remark about his "outfit" was inadmissible as a basis for conviction, it should also have excluded the subsequent discovery of the needle and the aspirin box as "fruits" of the inadmissible statement.

In ruling on the suppression motion, the trial court made oral findings paraphrased as follows:

1. Undisputed, credible testimony of the officers showed they reasonably believed that they were responding to a potentially volatile situation tied to a domestic dispute and potential cocaine use.

2. Having verified certain details of the sketchy information given them, the officers reasonably believed they or other persons in the environs were in danger and, therefore, appropriately frisked defendant for dangerous weapons.

3. The pat down of defendant's coat led to inquiry into the nature of the hard object in his coat to which defendant replied, "It's my outfit." This statement justified the officer's going to defendant's pocket and removing the syringe and small box as part of a search for his protection.

4. Because the officers exercised their legal prerogative not to give defendant a Miranda warning prior to defendant's response, his answer became inadmissible except for the purpose of determining the sufficiency of the search and justifying the further frisk.

5. Because there was some evidence of cocaine usage and cocaine may be ingested by using needles, police need to conduct a "very, very thorough" search to protect themselves and others.

6. Defendant cannot argue that the syringe and pillbox should be suppressed as fruits of a statement obtained in violation of *Miranda*. Instead, the syringe

**1.** Identification of the object as false teeth apparently occurred at some time after defendant

had responded verbally to the officer's question.

and pillbox would have inevitably been discovered as "the fruits of an otherwise reasonable pat down, in that once having felt a hard object they should have gone on with the search, regardless of what the defendant had said."[2]

When the trial court denied defendant's motion to suppress, defendant entered into a plea bargain after which the trial court found him guilty of attempted possession of a controlled substance, a class A misdemeanor. Defendant conditioned his plea upon his right to appeal the denial of his motion to suppress.[3] The trial court sentenced defendant to twelve months in the Salt Lake County Jail and ordered the penalty to run concurrently with time defendant had been serving at the Utah State Prison prior to his parole. This appeal followed.

## ANALYSIS

In challenging the police officers' actions during their confrontation with him, defendant did not question the propriety of their initially stopping him. Instead, defendant asserts that the pat down search was unnecessary and intrusive because his actions created no legitimate fear of danger. Because we find the frisk issue to be determinative, we need not decide whether the incriminating evidence subsequently discovered should have been suppressed as resulting from defendant's inadmissible response to a question from the officer frisking him.

### Standard of Review

■ When reviewing a trial court's decision to grant or deny a motion to suppress, this court will uphold the trial court's underlying findings of fact unless they are clearly erroneous. *State v. Lopes*, 552 P.2d 120, 121 (Utah 1976); *State v. Bradford*, 839 P.2d 866, 868–69 (Utah App.1992); *State v. Hunter*, 831 P.2d 1033, 1035–36 (Utah App.1992). Whether reasonable suspicion exists in investigative detentions may present a question of fact. *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987); *State v. Robinson*, 797 P.2d 431, 435 (Utah App.1990). However, a more recent Utah Supreme Court decision suggests that a two step analysis is appropriate, and the final determination of lawfulness of a detention or search is reviewed for correctness. *State v. Thurman*, 846 P.2d 1256, 1268–71 (Utah 1993). *See also State v. Strickling*, 844 P.2d 979, 981 (Utah App. 1992). The result in this case, however, is the same under either standard of review.

■ Additionally, "as in all Fourth Amendment cases, we are obligated to look at all the facts and circumstances of th[e] case in light of the principles set forth in ... prior decisions." *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976). Therefore, if we find the trial court failed to evaluate the significance of uncontroverted facts, or facts as the court found them, in terms of relevant principles developed through precedent, we may review the trial court's conclusion of reasonableness under a correction-of-error standard, deciding that this conclusion was "induced by an erroneous view of the law." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987) (citations omitted). *See also Thurman*, 846 P.2d at 1268–72 & n. 11; *State v. Rochell*, 850 P.2d 480 (Utah App.1993); *State v. Munsen*, 821 P.2d 13, 14–16 (Utah App.1991), *cert. denied*, 843 P.2d 516 (Utah 1992); *State v. Carter*, 812 P.2d 460, 466 n. 6 (Utah App. 1991), *cert. denied*, 836 P.2d 1383 (Utah 1992).

### The *Terry* Frisk Doctrine

In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968), the United States Supreme Court validated the frisk following an investigatory stop to enable police officers to protect themselves

---

**2.** The court made additional findings of fact which we do not detail here as they are unnecessary to our disposition of this case.

**3.** The right to a conditional plea was upheld in *State v. Sery*, 758 P.2d 935, 939 (Utah App.1988).

by searching and disarming potentially dangerous suspects.[4] That Court, however, also declared that the Fourth Amendment unquestionably protected suspects subjected to investigatory confrontations. *Id.* at 20, 88 S.Ct. at 1879. Each frisk, therefore, must be "justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* The State has the burden to show that circumstances created the need for the frisk. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

The *Terry* Court specifically held that a frisk was reasonable (1) "where a police officer observes unusual conduct" which he interprets "in light of his experience" as indicating possible criminal activity and present danger, (2) "where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and (3) where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or other's safety."[5] *Id.* at 30, 88 S.Ct. at 1884. The *Terry* Court anticipated further development of the constitutional limitations on a frisk for weapons "in the concrete factual circumstances of individual cases." *Id.* at 29, 88 S.Ct. at 1884 (citing *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (decided the same day as the *Terry* case)). However, while different circumstances may require modification of the *Terry* components of a

reasonable frisk, the lawfulness of every frisk remains subject to the "central inquiry under the Fourth Amendment—the reasonableness *in all the circumstances* of the particular governmental invasion of a citizen's personal security." *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878–79 (emphasis added).

### Reasonable Conclusion that Criminal Activity might be Afoot and the Suspect might be Armed and Presently Dangerous

The *Terry* Court refused to sanction any intrusion based on nothing more substantial than "inarticulate hunches." *Terry*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883 (1968). Instead, prior to instituting a frisk, a police officer must reasonably conclude in light of his experience that the unusual conduct he observes might suggest criminal activity and danger. *Id.* at 30, 88 S.Ct. at 1884. This conclusion need not be based on absolute certainty that the individual is armed, *id.* at 27, 88 S.Ct. at 1883, but rather depends on "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."[6] *Id.* An officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880.

Defendant argued that, by contrast to *Terry*, the police officers' limited surveil-

---

**4.** The *Terry* Court described a frisk as "a carefully limited search of the outer clothing ... in an attempt to discover weapons which might be used to assault" an officer. *Id.* at 30, 88 S.Ct. at 1885.

**5.** The Utah legislature codified the *Terry* frisk doctrine in a statutory provision which states:

> A peace officer who has stopped a person temporarily for questioning may frisk the person for a dangerous weapon if he reasonably believes he or any other person is in danger. Utah Code Ann. § 77–7–16 (1980). Utah courts have required interpretation of this provision to be consistent with the narrowly drawn exceptions to the warrant requirement described in *Terry. State v. Roybal*, 716 P.2d 291, 292 (1986); *see State v. Carter*, 707 P.2d 656, 659 (Utah 1985). In assessing the reasonableness of a

frisk, Utah courts have added, "it is not essential that the officer actually be in fear." *Roybal*, 716 P.2d at 293.

**6.** In the *Terry* case, the officer frisking the suspect Terry observed specific circumstances indicating possible criminal activity by a potentially dangerous suspect. The officer, a plain-clothed policeman on afternoon patrol, observed two men loitering on a street corner for an extended time in a neighborhood that officer had patrolled for over thirty years. *Id.* at 5, 88 S.Ct. at 1871. He saw the two men repeatedly pacing a route, pausing to stare in the same store window and then conferencing on the corner. *Id.* at 6, 88 S.Ct. at 1872. The Court found that these facts constituted articulable, objective grounds upon which the officer could conclude that. the men were about to stage a daylight robbery. *Id.* at 21–22, 88 S.Ct. at 1880–81.

lance and observation of him prior to instituting the frisk demonstrated no articulable facts from which a reasonable officer could infer the possibility of crime or danger. In its findings relevant to this contention, the trial court stated that the officers had observed, in the Westridge Club parking lot, a man and a woman in a vehicle reasonably corresponding to the "otherwise sketchy information" provided by the informant's call. Defendant claims that while these observations verified details serving to identify him as the subject of the call, they did not relate to the alleged or any other criminal activity, either completed, in process, or intended. According to defendant, the observed details were, therefore, immaterial to a reasonable conclusion that anyone stood in present danger.

In reviewing the record, we note Officer Yurgelon's testimony that his observation of defendant prior to meeting him was limited to seeing "defendant White kind of leaning off to his side a little bit." He also stated that upon confronting defendant he noticed that defendant, whom he recognized as a former inmate of the prison, was wearing a winter type coat.

In assessing the significance of these initial observations we must consider the Utah Supreme Court's invalidation of a search based on the suspect's "common gestures and movements." *State v. Schlosser*, 774 P.2d 1132, 1138 (Utah 1989) (finding no reasonable suspicion of criminal activity based only on furtive gestures and a fidgeting appearance because those motions could have resulted from non-criminal activity). The *Schlosser* court considered a search instituted on this basis to have been conducted pursuant to "a mere 'hunch,' not

an articulate suspicion that satisfies the Fourth Amendment." *Id.*

In this case, the gesture observed by the officer was innocuous. Further, previous arrest for criminal conduct may be relevant to a suspicion that a suspect might be presently dangerous, depending on the nature of the charge, but is not determinative. Finally, while the appearance of a suspicious bulge in the outer clothing of a suspect may be a factor indicating that the suspect might be armed, *see State v. Carter*, 707 P.2d 656, 660 (Utah 1985), simply wearing a winter coat is not. Thus, personal observations did not provide articulable facts on which to form a reasonable suspicion of danger, much less criminal activity. Defendant, in fact, argued that the officers based their initial safety concerns on third party hearsay rather than on personal surveillance or observation of actions indicative of criminal activity.

## Reliability of Information from a Third Party

Because the totality of circumstances determines reasonableness in a Fourth Amendment inquiry, the reliability of the information upon which a particular frisk is based becomes a critical element in our evaluation of that frisk. Although the Supreme Court has validated a frisk based on information from a third party rather than personal surveillance, it noted that the source of the tip must provide "enough indicia of reliability to justify" interference with the privacy rights of a suspect.[7] *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972). The Court also stressed the fact sensitivity of assessing the reliability of a third party

---

**7.** Justice Marshall dissented in *Williams* because he considered the informant's tip inadequate to justify the frisk. *Id.* at 157, 92 S.Ct. at 1928 (Marshall, J. dissenting). His dissent is instructive because it cited other Supreme Court opinions setting standards for the reliability of witnesses whose information would impact search and seizure decisions. A search is not justified by "conclusory allegations of an unnamed informant who is allegedly credible." *Id.* (citing *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). An informant must be

"generally trustworthy and have obtained his information in a reliable way." *Id.* at 157, 92 S.Ct. at 1929–30 (citing *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). Based on these standards, Justice Marshall concluded that while *Terry* allowed an officer to act on "*reliable* information short of probable cause ... the officer may not use unreliable, unsubstantiated, conclusory hearsay to justify an invasion of liberty." *Id.* at 159, 92 S.Ct. at 1930.

tip. *Id.* at 146, 92 S.Ct. at 1923 (specifically stating that a known informer constituted a stronger justification than an anonymous telephone tip).

In this case, the trial court made no finding about the reliability of the information given to the officers. We note that although the third party informant was named, the officers had no experience with defendant's former spouse which would allow them to assume the accuracy of the information she gave them and they did no independent investigation which would assist them in assessing its accuracy.

■ The trial court did find that the officers' credible testimony indicated the third party information reasonably led them to believe they were responding to a potentially volatile situation tied to a domestic dispute and potential cocaine use. In evaluating that finding, we accept the trial court's assessment of the officers' credibility and agree that the officers, anticipating a volatile situation, reasonably took precautions preparing for their encounter with defendant. However, even if this information might have reasonably prompted the investigatory stop of defendant, it would not necessarily justify immediately frisking him. The facts relevant to justifying the frisk are distinct from those justifying the stop. *United States v. Thomas,* 863 F.2d 622, 628 (9th Cir.1988). *See Florida v. Royer,* 460 U.S. 491, 499–500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (discussing limitations on the scope of search and seizure as equivalent but separate from those on stops). To justify a frisk, the totality of available information must sustain an officer's reasonable suspicion of both criminal activity and danger throughout the initial investigatory stages of the encounter and until the frisk actually commenced. In other words, even when reasonable suspicion is conceded as justifying the initial stop, as it is here, there must be separately established reasonable suspicion of criminal behavior when the frisk takes place, as well as a reasonable basis for believing there exists a danger to officers or others in the vicinity.

In this case, the questionable reliability of Ms. White's allegations should have sensitized both the officers and the trial court to the need for considering whether the frisk could be justified independently of the stop. Circumstantial information which might dispel or support initial concern that a frisk might be necessary, therefore, becomes particularly relevant.

### Reasonable Inquiry

In justifying the frisk in *Terry,* the Court considered it important that the police officer investigating suspicious behavior "identifie[d] himself as a policeman and ma[de] reasonable inquiries" of the suspects. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Since that decision, the Supreme Court has indicated an officer may forego this initial inquiry when, because of specific circumstances, questioning would be dangerous to the police officer. *See Adams v. Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

The *Williams* Court reviewed a case in which a known, reliable informant told a solo officer that the suspect he would encounter in a high crime area at 2:15 a.m. carried a gun in a particular place. *Id.* at 144–45, 92 S.Ct. at 1922. The threat implied by this reliable tip, when compounded by the suspect's failure to cooperate with the officer's instructions, justified a frisk without first questioning the suspect. *Id.* at 148, 92 S.Ct. at 1924. Defendant, however, questions whether comparable circumstances existed in his case. Defendant claims that his cooperative behavior should immediately have diffused any imminent sense of danger. Once that sense of danger reasonably dissipated, he argues that minimal inquiry would have dispelled any lingering suspicions about the possibility of criminal activity or danger to the investigating officers.

We agree with defendant that his case is distinguishable from *Williams.* The officers converged on defendant in mid-afternoon, greatly outnumbered him and presumably were armed. They observed nothing indicative of criminal activity and had

been given no prior information indicating that defendant was armed. These circumstances, combined with defendant's lack of menacing behavior, created an environment in which the responding officers could question defendant without fear for their safety. Where a confrontation develops in such a manner that questioning can be safely undertaken to substantiate or dispel suspicions originally aroused by third party hearsay rather than actual observation, preliminary inquiry may be especially appropriate.

Even if preliminary inquiry is not required, commentary has indicated that

it should not be assumed that whatever might happen between the initiation of the stop and the initiation of the frisk is of no relevance, for this is not the case. If by investigation or happenstance the quantum of evidence needed to justify a forcible stop has dissipated during this interval, then it is not permissible to frisk.

Wayne R. LaFave, 3 *Search and Seizure*, § 9.4(a) at 502 (2nd ed. 1987). *See United States v. Di Re*, 332 U.S. 581, 594, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948) (finding suspicions of defendant's involvement in criminal activity based on "mere presence, seem[ed] diminished, if not destroyed," by actions of informant once the encounter actually commenced).

### Response of the Suspect

The *Terry* Court found significance in the fact that, once approached by the officers, nothing that the suspects said or did dispelled the suspicion that criminal activity was afoot and that the suspects might be armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). *See also Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). By contrast, defendant claims his cooperative and calm behavior should have undermined any reasonable initial suspicion that he was dangerous, either because he was armed or because he was high on drugs.

### The Automatic Frisk

The concurrence in *Terry* first noted that experience generally showed that the suspicion of certain types of criminal activity suggested an increased likelihood that the suspect might be armed and dangerous. According to Justice Harlan, where there is "an articulable suspicion of a crime of violence," and an officer makes a justified stop, the potential that the suspect is dangerous is so great that "the right to frisk must be immediate and automatic." *Id.* at 33, 88 S.Ct. at 1886 (Harlan, J. concurring).[8] *See also Sibron v. New York*, 392 U.S. 40, 73–74, 88 S.Ct. 1889, 1907, 20 L.Ed.2d 917 (1968) (Harlan, J. concurring).

Commentary has since suggested that the right to frisk should be automatic whenever "the suspect has been stopped upon the suspicion that he has committed, was committing or was about to commit a type of crime for which the offender would likely be armed, whether the weapon would be used to actually commit the crime, to escape if the scheme went awry, or for protection against the victim or others involved." Wayne R. LaFave, 3 *Search and Seizure*, § 9.4(a) at 506 (2nd ed. 1987).[9]

**8.** Utah courts have also noted the significance of the nature of the suspected crime on the right to conduct an immediate frisk of a suspect. *See State v. Carter*, 707 P.2d 656, 660 (Utah 1985); *State v. Strickling*, 844 P.2d 979, 984 (Utah App. 1992). Specifically, the *Carter* court authorized the automatic frisk of a burglary suspect because the officer could reasonably believe that a burglar might carry dangerous tools or weapons in anticipation of strenuous objection from an intended victim. *Carter*, 707 P.2d at 660.

**9.** Certain Supreme Court justices, state judges, and commentary have questioned, however, whether suspicion of less violent criminal activity should justify an immediate frisk in the absence of circumstantial evidence supporting the possibility that a suspect is armed and presently dangerous. *Sibron*, 392 U.S. at 73–74, 88 S.Ct. at 1907 (Harlan, J. concurring). *See also State v. Chapman*, 841 P.2d 725, 730–32 (Utah App. 1992) (Orme, J. dissenting) (arguing that the violation of a loitering ordinance created an insufficient suspicion of danger to automatically justify a frisk). However, *State v. Hubbard*, No. 910718-CA, slip op. at 3 (Utah App. Aug. 27, 1993), noted that "the nature of the intrusions may differ when a stop to investigate past criminal behavior is involved," because a stop based on a past crime does not necessarily have the

In the incident before this court, information available to the officers prior to encountering defendant suggested his involvement in a domestic disturbance of unknown intensity some hours earlier. We recognize that domestic incidents can be violent and that police intervention in these volatile situations can be extremely dangerous. For this reason, we believe that the police responded appropriately to Ms. White's call by proceeding quickly to the scene. Although the officer's knowledge of the alleged domestic incident was minimal, they had neither time nor opportunity to corroborate the informant's allegations prior to responding to the call.

■ The State argues that based on an Arizona case, *State v. Greene*, 162 Ariz. 431, 784 P.2d 257, 259 (1989), a report of domestic violence would automatically place a frisk of the suspect within the ambit of Utah's frisk statute, Utah Code Ann. § 77-7-16. However, the facts of the *Greene* case are distinguishable from the circumstances of this case.[10] We also conclude that any immediate concern the officers might have felt for the defendant's female companion should have diminished when defendant separated himself from this companion by following police instructions and getting out of the car. At that point, any residual concern the officers harbored would have been completely dispelled by asking the companion if she were in distress and inquiring whether she were, in fact, the party involved in the earlier incident.

Because the officers failed to make these initial inquiries, they frisked a mellow and cooperative suspect in the company of a woman with no apparent relationship to the informant's allegation that a domestic incident had occurred earlier. We disagree with the State's contention that unfounded allegations of attenuated domestic violence should justify an immediate frisk when nothing the officers observe upon encountering the suspect supports any suspicion of present danger as the result of past participation in a domestic quarrel.

Defendant, on the other hand, argues that a conclusory allegation of an earlier domestic disturbance was not the actual motivating force behind the officers' stopping and frisking him. He claims that the police actions were a response to their suspicion of cocaine use by a parolee.

Cocaine use is not one of the drug related offenses categorized in commentary as inherently violent. LaFave lists "dealing in large quantities of narcotics" among the inherently dangerous suspected offenses along with "robbery, burglary, rape, assault with weapons, [and] homicide." La-Fave, § 9.4(a) at 506.[11] Similarly, in *State v. Dorsey*, 731 P.2d 1085, 1092 (Utah 1986) (Zimmerman, J. concurring), Justice Zimmerman stated that the frisk of individuals suspected of participating in moving large quantities of illegal drugs over long distances would be justified because an officer could assume reasonably that they "might be armed to protect themselves from criminals who might attempt to 'rip-off' a drug dealer." On the other hand, Justice Harlan questioned whether possession of narcotics fell into the category of crimes creating substantial risk. *Sibron*, 392 U.S. at 73-74, 88 S.Ct. at 1907 (Harlan, J. concurring).

---

same governmental interests as one pertaining to a potential immediate crime.

10. While the *Greene* court decided that police officers could respond immediately to a domestic violence call by entering the dwelling where a domestic incident was allegedly occurring, it did not discuss whether an alleged suspect could automatically be frisked. *Id.* Approving the immediate response of entering the site of an alleged domestic incident does not constitute authority to conduct automatically a frisk in the absence of any indication that the domestic inci-

dent was ongoing or any evidence that the parties present were those involved in the alleged dispute.

11. LaFave suggested that, with the exception of drug dealing, suspicion of drug related offenses should only require a frisk when other circumstances indicative of arms possession or danger are present. *See* LaFave, § 9.4(a) at 507 (discussing possession of small amounts of marijuana or liquor, and trafficking in small amounts of narcotics as circumstances authorizing frisk only in presence of other relevant circumstances).

In determining whether suspicion of drug use as opposed to drug dealing or possession should authorize an automatic frisk, we must remember that authority to permit a protective frisk for weapons "must be narrowly drawn." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.[12] Because the sole justification for this limited weapon search is the protection of the officer and nearby persons, the frisk must be confined to "an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29, 88 S.Ct. at 1884. Unlike a warrantless search "incident to a lawful arrest, [a frisk] is not justified by any need to prevent the disappearance or destruction of evidence of crime." *Id.*

The *Terry* Court generally found " 'no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails.' " *Id.* at 21, 88 S.Ct. at 1879 (quoting *Camara v. Municipal Court,* 387 U.S. 523, 534–37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)). Utah courts recognize officers' need to protect themselves and others when they "knowingly and willingly enter hostile environs to confront dangerous persons." *State v. Roybal,* 716 P.2d 291, 293 (Utah 1986). The trial court, in fact, found that the officer's awareness of potential cocaine use alerted the officers to the potential availability of needles and, therefore, automatically authorized a "very, very thorough" search, sufficiently elaborate to locate needles which could present a danger to the officers.

■ However, balancing defendant's right to be free of unreasonable interference against the police officers' right to protect themselves or others weighs against validating an automatic frisk based on third party allegations of cocaine use. Cocaine use is not a crime of violence comparable to dealing in large quantities of drugs. While drug use may present a greater danger than drug possession, it is not so inherently dangerous as to override the officers' duty to observe the suspected drug abuser for signs of current use, such as irrationality or disorientation, in light of their personal experience.

In fact, Officer Yurgelon's testimony indicated that he had the expertise to assess the likelihood that defendant was actually high on cocaine. His previous experience indicated that cocaine abusers acted "excited, excitable and hyper." The actions of defendant contradicted this expectation and the immediate frisk of defendant did not put this experience to its potentially valuable use.

### Multi-factor Analysis of Criminal Activity and Danger

■ Individually, none of the evaluative criteria described above are determinative of an officer's prospective decision on the necessity of a frisk, and no one factor controls a reviewing court's retrospective evaluation of whether a frisk was justified at its inception. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) (invalidating stops by border patrol officers based on the single factor of apparent Mexican ancestry). Instead, the police action must be a reasonable invasion of an individual's personal security in light of *all circumstances* of the particular encounter. *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968).[13]

---

**12.** The *Terry* Court acknowledged that a frisk subjects a suspect to the serious intrusion of a search, *id.* at 16–17, 88 S.Ct. at 1877, and refused to accept the State's argument that a "frisk" was a "mere 'minor intrusion and petty indignity.' " *Id.* at 10, 88 S.Ct. at 1874.

**13.** We have identified three Utah cases which have applied multi-factor analysis to justify frisks. *See State v. Roybal,* 716 P.2d 291 (Utah 1986) (validating a frisk where the suspect's actions indicated a ruse to initiate the encounter, suggested concealment of a weapon, and demonstrated hostility); *State v. Carter,* 707 P.2d 656 (Utah 1985) (allowing solo officer to frisk burglary suspect with suspicious bulge in pocket when officer confronted suspect in dark alley near burglary scene); *State v. Rochell,* 850 P.2d 480 (Utah App.1993) (validating frisk after officer stopped suspect for traffic violation, smelled alcohol on his breath, saw an open container in car, observed suspicious bulge in his pocket, and noted hesitancy in responding to several questions).

The trial court's findings in this case failed to assess all of the facts deemed relevant by prior case law. Courts, however, are required to consider the totality of facts and circumstances related to a Fourth Amendment issue "in light of the principles set forth in ... prior decisions." *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976).

In objectively reviewing the totality of facts in this case in light of this requirement, we note that the allegations of criminal activity were provided by unverified third party hearsay. The suggestion of a domestic disturbance was attenuated, and the allegation of drug use did not generally implicate an inherently dangerous situation or specifically indicate that the suspect was armed. Officer Yurgelon approached defendant under relatively safe conditions, during midday, in a parking lot, and in the company of three other officers. On-scene observations allowed the officers to make a positive identification of the suspect, but they did not indicate present or intended criminal activity. The officers made no inquiries concerning the alleged domestic violence or cocaine use and the suspect's companion expressed no distress. During his minimal contact with defendant prior to frisking him, Officer Yurgelon noted that defendant was cooperative and mellow and followed directions without protest. This affect and response contradicted Officer Yurgelon's experience and expectations of an individual under the influence of cocaine. Although defendant was recognized as a former prison inmate and was wearing a winter coat, the officers observed neither a suspicious bulge nor any evasive or threatening behavior.

These facts demonstrate no circumstances indicating that an automatic or immediate frisk was appropriate. The officers should instead have approached the encounter with awareness that the information prompting the investigatory stop of defendant was unsubstantiated. Circumstances allowed the officers time to reassess the allegations of criminal activity and their initial suspicions of danger without being subjected to "unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23, 88 S.Ct. at 1881. Defendant's cooperative responses and mellow behavior should have raised doubts about the reliability of the third party hearsay which likely could have been resolved by questioning defendant or his companion.

Having reevaluated the circumstantial evidence examined by the trial court, we conclude that the trial court (1) justified the frisk based upon unreliable and unverified allegations that were not substantiated by articulable, specific facts from which the officers could infer a reasonable possibility of criminal activity or danger, and (2) ignored undisputed facts indicating that the need for a frisk had dissipated. We, therefore, conclude that the trial court erred in deciding that the frisk of defendant was lawful.

CONCLUSION

Because, at the time the police officer frisked defendant, he lacked a reasonable suspicion that criminal activity might be afoot and that defendant might be armed and presently dangerous, we conclude that the frisk was unlawful and that evidence procured as a result of that frisk must be suppressed. We, therefore, remand this case to the trial court for disposition consistent with this opinion.

GARFF and ORME, JJ., concur.