2009 UT App 202

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jack WILKINSON, Defendant and Appellant.**

No. 20070325–CA.

Court of Appeals of Utah.

July 30, 2009.

Margaret P. Lindsay, Spanish Fork, for Appellant.

Mark L. Shurtleff, Joanne C. Slotnik, and Marian Decker, Salt Lake City, for Appellee.

Before Judges ORME, DAVIS, and McHUGH.

## OPINION

ORME, Judge:

¶ 1 Defendant Jack Wilkinson appeals his jury conviction, arguing that the trial court incorrectly denied his motion to suppress evidence.[1] Although the totality of the circumstances created reasonable suspicion of criminal activity to justify stopping Wilkinson, *see Alabama v. White*, 496 U.S. 325, 331–32, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (holding reliable informant tip provided reasonable suspicion of criminal activity, given totality of circumstances), the circumstances did not create reasonable suspicion

---

1. Because Wilkinson challenges only the denial of the motion to suppress, we consider only the evidence before the trial court when it ruled on the suppression motion. We will not consider testimony presented at the preliminary hearing or trial because Wilkinson does not challenge the sufficiency of the evidence to bind him over for trial or to convict him. If inconsistencies existed in the testimony, these could have been pointed out for impeachment purposes.

that Wilkinson was armed so as to justify a *Terry* frisk, *see Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (stating a police officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous"). Accordingly, we reverse the denial of the motion to suppress and remand for a new trial.

## BACKGROUND [2]

¶ 2 In May 2006, a confidential informant (CI) told Officer Bebe that Mary Albert "had traveled to Salt Lake to pick up an amount of methamphetamine and [was going to] bring it back to Utah County and distribute it." CI had an on-going arrangement with the police, Officer Bebe knew CI's identity and other personal information, and Officer Bebe had worked with CI over a six-month period "on numerous occasions." During these occasions, CI conducted controlled buys and furnished tips to police about individuals distributing controlled substances. Officer Bebe found CI's past information to be reliable, and the prior information had led to a number of arrests. CI informed Officer Bebe that Wilkinson was with Albert, but CI did not say anyone but Albert would be purchasing methamphetamine.

¶ 3 At Officer Bebe's request, CI called Albert and requested she sell CI a "teener"[3] of methamphetamine. Albert agreed to do so, and they arranged to meet at Albert's residence to complete the transaction. Officer Bebe, along with two other detectives, set up surveillance near Albert's home.

¶ 4 While waiting for Albert to arrive, CI initiated a phone call with Albert during which Albert indicated she was on her way. CI thereafter placed another phone call to check on Albert's status, and Albert said "she was on her way, ... by RC Willey in Orem taking the back roads[,] and would be there shortly." CI told Albert that he had people waiting and wanted her to hurry.

¶ 5 Officer Bebe was "very familiar with [Albert's] vehicle" and easily recognized it as it approached the surveillance point. He observed that the five to ten minutes it took Albert to arrive seemed consistent with the time required to travel from RC Willey to his location. As the vehicle passed, Officer Bebe recognized Albert and Wilkinson, who were passengers in the vehicle.

¶ 6 After the vehicle passed, Officer Bebe initiated the flashing lights and siren of his unmarked police minivan. Officer Bebe's purpose for stopping the vehicle was to investigate the possible distribution of methamphetamine. The vehicle traveled about 400 feet before pulling over, which Officer Bebe considered an unreasonable amount of time to stop. While driving behind the vehicle, Officer Bebe observed back seat passengers "reaching to the very rear of the Jeep Cherokee, and [he] observed Mary Albert specifically slide down in her seat and then come back up." With Officer Bebe's three years of experience as a narcotics officer, he testified that such movements concerned him because "[i]ndividuals in the drug culture often arm themselves to protect themselves both from the criminal element and from law enforcement," and because such individuals "discard ... hide, secrete, damage, [or] destroy evidence."

¶ 7 After the vehicle stopped, Officer Bebe approached the driver's side of the vehicle and addressed the driver, Albert's son, who indicated that he did not have his driver license. At this point, Officer Bebe opened the driver's-side door and asked the driver to step out. Officer Bebe later explained that his actions were for "safety" and to prevent "the immediate destruction of evidence." As the driver stepped out of the vehicle, Officer Bebe observed a syringe cap "on the side near the post of the door." Officer Bebe associated a syringe with "intravenous ingestion of methamphetamine." Officer Bebe

**2.** "We recite the facts in detail because the legal analysis in a search and seizure case is highly fact dependent." *State v. Warren*, 2003 UT 36, ¶ 2, 78 P.3d 590.

**3.** "[A] teener is 1/16 of an ounce," or "a little more than 1.75 grams." San Francisco Aids

Foundation, *Weights and Measures*, http://www.tweaker.org/html/crystal101/weights.html (last visited July 19, 2009). *See* Jacob Santini & Ashley Estes, *Speed Trap*, The Salt Lake Tribune, Sept. 2, 2001, at A1.

then advised all the vehicle's occupants "to put their hands where [he] could see them." Officer Bebe noticed that the driver had bloodshot eyes, had dilated pupils, and "was speaking very loudly," all of which Officer Bebe interpreted as indicative of methamphetamine use. Officer Bebe conducted a *Terry* frisk of the driver, which revealed no weapons, and asked the driver to wait at the rear of the vehicle with the other detectives.

¶ 8 Officer Bebe then opened the passenger door where Wilkinson was seated and asked him to step out of the vehicle. As this occurred, Officer Bebe noticed that Wilkinson's pupils were dilated, there was "redness to the conjunctiva of his eyes," and "[h]e appeared flush." Officer Bebe believed Wilkinson might have methamphetamine on his person. Officer Bebe testified that three reasons justified his request for Wilkinson to step out of the vehicle: the syringe cap, the condition of the driver, and CI's information. Officer Bebe asked Wilkinson if he had any weapons, but he did not remember Wilkinson's response. Officer Bebe then performed a *Terry* frisk of Wilkinson. He felt several small, indiscernible items in Wilkinson's pockets. Officer Bebe reached into Wilkinson's pockets and extracted the contents. The search revealed a small pocket knife, "a bindle of a dollar bill," and a plastic baggie. Both the bindle and baggie contained what Officer Bebe believed to be methamphetamine.

¶ 9 Albert was also searched, and no drugs were found on her person. A search of the vehicle, though, revealed "syringes, one of which contained a small amount of a clear liquid," and a "baggie that contained a white crystallis substance in one of the rear seat passenger's purse." Wilkinson was charged with possession and use of a controlled substance, *see* Utah Code Ann. § 58–37–8(2)(a)(i) (2007), in a drug free zone, *see id.* § 58–37–8(4)(a)(v), a second degree felony, *see id.* § 58–37–8(2)(b)(ii), (4)(c), and possession of drug paraphernalia, *see id.* § 58–37a–5(1), in a drug free zone, *see id.* § 58–37–8(4)(a)(v), a class A misdemeanor, *see id.* §§ 58–37a–5(1), 58–37–8(4)(a), (4)(c).[4] Wilkinson filed a motion to suppress the evidence found in his pockets, which motion the trial court denied. The trial court determined that probable cause existed to stop the vehicle and that reasonable suspicion existed to frisk Wilkinson.[5] A jury trial followed in which Wilkinson was convicted.

## ISSUE AND STANDARD OF REVIEW

¶ 10 Wilkinson challenges the trial court's denial of his motion to suppress, arguing that the officers did not have reasonable suspicion of criminal activity to stop the vehicle in which he was riding and that Officer Bebe had no reasonable suspicion to frisk him, even if it was legal to stop the vehicle. "Challenges to suppression rulings present questions of law that we review for correctness," *State v. Wilkinson,*[6] 2008 UT App 395, ¶ 5, 197 P.3d 96, "without deference to the trial court's application of the law to the facts," *Layton City v. Oliver,* 2006 UT App 244, ¶ 11, 139 P.3d 281.

## ANALYSIS

¶ 11 Wilkinson first challenges the stop's legality. Under settled case law, the stop was clearly valid. *See Alabama v. White,* 496 U.S. 325, 326–27, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (evaluating if an informant's tip established reasonable suspicion of criminal activity and stating "both the content of information ... and its degree of reliability" must be considered); *State v.*

---

4. The information also charged him with possession with intent to distribute, *see* Utah Code Ann. § 58–37–8(1)(a)(iii) (2007), but this count apparently was dropped by the time of the preliminary hearing.

5. On appeal, both parties center their arguments around the reasonable suspicion standard actually required for both the stop and frisk. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S:Ct. 1868, 20 L.Ed.2d 889 (1968). Neither side argues the applicability of the more stringent probable cause standard required to effect a search, *see Illinois v. Gates,* 462 U.S. 213, 216, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), or an arrest, *see Brinegar v. United States,* 338 U.S. 160, 174–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

6. Our standards of review are, no doubt, becoming increasingly familiar to Wilkinson. *See generally State v. Wilkinson,* 2008 UT App 395, 197 P.3d 96; *State v. Wilkinson,* 2002 UT App 40U (mem.).

*James,* 2000 UT 80, ¶ 10, 13 P.3d 576 (stating that "officers may temporarily detain a vehicle and its occupants upon reasonable suspicion of criminal activity for the purpose of conducting a limited investigation of the suspicion" and that "[r]easonable suspicion may be based on information provided by a citizen if that information, coupled with available corroboration, is sufficiently reliable under the totality of the circumstances"), *cert. denied,* 29 P.3d 1 (Utah 2001).

▓▓ ¶ 12 Having readily concluded the stop was valid, we now focus on the propriety of the *Terry* frisk of Wilkinson, *see State v. White,* 856 P.2d 656, 662 (Utah Ct.App.1993) ("The facts relevant to justifying the frisk are distinct from those justifying the stop."), and whether the facts and circumstances objectively support a reasonable suspicion of Wilkinson being armed and dangerous, *see State v. Warren,* 2003 UT 36, ¶¶ 13–14, 78 P.3d 590. "The legality of a frisk for weapons, absent probable cause, is governed by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 ... (1968), and its progeny."[7] *State v. Lafond,* 2003 UT App 101, ¶ 18, 68 P.3d 1043, *cert. denied,* 72 P.3d 685 (Utah 2003). "The *sole* purpose for allowing the frisk is to protect the officer and other[s] by neutralizing potential weapons." *Warren,* 2003 UT 36, ¶ 13, 78 P.3d 590 (emphasis added). The State must prove the frisk was justified by showing specific, articulable facts that, viewed "objectively according to the totality of the circumstances," *id.* ¶ 14, demonstrate that "the officer reasonably believe[d] a person [wa]s 'armed and presently dangerous to the officer or others,'" *id.* ¶ 13 (quoting *Terry,* 392 U.S. at 24, 88 S.Ct. 1868). *See also White,* 856 P.2d at 660 (stating reasonable suspicion "depends on 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'") (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868) (footnote omitted). There are two basic situations in which it may be concluded that a reasonable suspicion existed that a person was armed and dangerous so as to justify a *Terry* frisk: first, when the crime being in-

vestigated is itself inherently suggestive of the likelihood the suspect will be armed and, second, when the individualized facts lead an officer to believe the particular suspect is armed—essentially without regard to the nature of the crime being investigated. *See Lafond,* 2003 UT App 101, ¶ 19, 68 P.3d 1043.

## I. Reasonable Suspicion Based on the Crime's Inherently

### Dangerous Nature

▓▓ ¶ 13 The first situation that could justify a *Terry* frisk involves investigation of " '[c]rimes that, by their nature, suggest the presence of weapons.'" *State v. Warren,* 2001 UT App 346, ¶ 15, 37 P.3d 270 (citing 4 Wayne R. Lafave, *Search and Seizure* § 9.5(a), at 255–56 (3d ed.1996)), *aff'd,* 2003 UT 36, 78 P.3d 590. "[D]ealing in large quantities of narcotics" is one example of a crime that would permit a frisk as a matter of routine based on its inherent nature. *Id.* (citation and internal quotation marks omitted). *See also White,* 856 P.2d at 664 ("[T]he frisk of individuals suspected of participating in moving large quantities of illegal drugs over long distances would be justified because an officer could assume reasonably that they 'might be armed to protect themselves from criminals who might attempt to "rip-off" a drug dealer.'") (quoting *State v. Dorsey,* 731 P.2d 1085, 1092 (Utah 1986) (Zimmerman, J. concurring)). However, a mere allegation of drug use, possession, or small-scale distribution would not justify an automatic frisk. *See Sibron v. New York,* 392 U.S. 40, 64–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (invalidating a frisk based solely on an officer's belief that a person had drugs on his person in companion case to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968)); *White,* 856 P.2d at 665–66 (determining that drug use alone is insufficient to justify an automatic search).

¶ 14 In the case before us, all the facts, viewed objectively, lead to the conclusion that the officers were investigating a small-scale distribution and personal-use case—not

---

**7.** The *Terry* doctrine has been codified in Utah. *See* Utah Code Ann. § 77-7-16 (2008) ("A peace officer who has stopped a person temporarily for

questioning may frisk the person for a dangerous weapon if he reasonably believes he or any other person is in danger.").

large-scale drug dealers. Although Albert planned on selling a "teener" of methamphetamine to CI, the quantity of drugs involved was too small to suggest a large-scale distribution that might have warranted an automatic frisk based on the inherent dangerousness of the crime.[8] Nothing in CI's report or the investigating officers' observations suggested the likely quantity of drugs was consistent with anything other than a user or small-time dealer buying a little extra for an acquaintance while in the process of purchasing her own supply.[9] And Officer Bebe's observations revealed that methamphetamine had already been or was in the process of being consumed, i.e., Officer Bebe observed that the driver and Wilkinson were impaired at the time of the stop and a syringe cap was found without a syringe. Moreover, while Officer Bebe testified that he readily recognized both Albert and Wilkinson, he did not describe either of them as "drug dealers." Instead he described them as "in the drug culture," a broad term which, of course, includes personal use and small-scale distribution as well as large-scale distribution.[10]

¶ 15 The power to automatically search a suspect based on the inherent nature of the crime being committed must be limited to specific crimes suggestive of the distinct likelihood a suspect is armed. *See White*, 856 P.2d at 665 ("In determining whether suspicion of drug use as opposed to drug dealing or possession should authorize an automatic frisk, we must remember that authority to permit a protective frisk for weapons 'must be narrowly drawn.'") (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). An automatic frisk is not allowed in every stop that involves illegal drugs. *See Lafond*, 2003 UT App 101, ¶ 19, 68 P.3d 1043 (identifying "trafficking in small quantities of narcotics" as not an inherently dangerous crime) (citation and internal quotation marks omitted). Accordingly, something more than the mere nature of the crime being investigated was needed to justify the frisk in this case.

## II. Reasonable Suspicion Based on Facts and Circumstances Unique to a Particular Suspect

¶ 16 A *Terry* frisk is also justified when the particular facts and circumstances lead the investigating officer to reasonably believe that a suspect is armed and dangerous even though the crime being investigated does not itself suggest the suspect is likely to be armed. *See id.* ¶¶ 18, 19. Examples of what could constitute reasonable suspicion that a particular suspect is armed and dangerous include

> a characteristic bulge in the suspect's clothing; observation of an object in the pocket which might be a weapon; an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; an otherwise inexplicable failure to remove a hand from a pocket; awkward movements manifest-

---

8. A "teener" can be divided into seven "quarters"; each quarter equals 1/4 gram or 0.01 ounce. San Francisco Aids Foundation, *Weights and Measures*, http://www.tweaker.org/html/crystal101/ weights.html (last visited July 19, 2009). Experts have testified that for personal use, a methamphetamine user would generally purchase between 0.25 to 2.4 grams. *See State v. Rothlisberger*, 2006 UT 49, ¶ 30, 147 P.3d 1176 (recounting that police chief "testified that for personal use, individuals typically purchase [a] quarter or half grams ... [m]aybe even at the most a gram") (internal quotation marks omitted) (alterations and omission in original); *State v. Morgan*, 2001 UT 87, ¶ 5, 34 P.3d 767 (stating that officer testified 2.4 grams was consistent with personal use and that methamphetamine is typically packaged in three to six gram quantities). All things considered, then, the purchase of a "teener" (approximately 1.75 grams) is suggestive of personal use rather than large-scale distribution.

9. The State asserts that the officers did not know the quantity of drugs involved at the time of the stop. However, CI, at the Officer's direction, asked only for a "teener" instead of a larger quantity of drugs. And the State cites no authority for the proposition that investigating officers are free to assume, in the absence of any facts so suggesting, that any small sale of illegal drugs is by a major drug trafficker rather than a small-time dealer.

10. Officer Bebe testified that "[i]ndividuals in the drug culture often arm themselves." As previously discussed, the cases recognizing that drug crimes can be included among those which are inherently dangerous and may warrant a routine *Terry* frisk of suspects have distinguished between large-scale dealers, on the one hand, and users and small-scale dealers, on the other. Only the former may be presumed to be armed by virtue of the nature of their crime.

ing an apparent effort to conceal something under his jacket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon; awareness that the suspect had previously been engaged in serious criminal conduct; awareness that the suspect had previously been armed; awareness of recent erratic and aggressive conduct by the suspect; discovery of a weapon in the suspect's possession; discovery that the suspect is wearing a bullet proof vest as to which he makes evasive denials; and awareness of circumstances which might prompt the suspect to take defensive action because of a misunderstanding of the officer's authority or purpose.

4 Wayne R. LaFave, *Search and Seizure* § 9.6(a), at 628–30 (4th ed.2004) (footnotes omitted).

 ¶ 17 *Terry* requires a reasonable, objective belief that the individual being searched is armed and dangerous. *See Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked[.]").

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

*Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889 (1968) (companion case to *Terry v. Ohio*,

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

¶ 18 Neither the State on appeal nor Officer Bebe in his testimony pointed to any specific facts, akin to the ones recited above, that would justify the frisk of Wilkinson based on a reasonable belief that he was armed and dangerous. The State argues that the stop occurred late at night, the officers were outnumbered by the vehicle's occupants, the passengers made furtive movements, the driver and Wilkinson were under the influence of drugs, and Officer Bebe believed that people in the "drug culture"—a category that we have noted is much broader than the major trafficker who can be presumed to be armed—often arm themselves.[11]

¶ 19 None of these facts, individually or collectively, create reasonable suspicion that Wilkinson may have been armed and dangerous. Only two facts specifically implicate Wilkinson: he was under the influence of drugs and he reached into the back of the vehicle while the vehicle was stopping. Merely being under the influence of drugs, without observable behavior to put the officer on guard, does not suggest a person is armed. *Cf. State v. White*, 856 P.2d 656, 665–66 (Utah Ct.App.1993) (determining that drug use is insufficient to justify a frisk). In addition, " 'common gestures and movements' " are insufficient to create reasonable suspicion that the suspect is armed. *Id.* at 661 (citation omitted). In the context of this case, Wilkinson reaching into the rear of the vehicle is more consistent with disposing of evidence than with arming himself.

¶ 20 The other facts the State relies on also do not create reasonable suspicion that Wilkinson may have been armed. The facts that the stop occurred late at night, *see State v. Warren*, 2003 UT 36, ¶ 33 n. 5, 78 P.3d 590 (discussing that darkness is not enough to support a reasonable suspicion of being armed), and that the vehicle took what Officer Bebe classified as an unreasonable

---

11. The State also argues that the time it took for the vehicle to stop was unreasonable. The vehicle took only 400 feet to stop, which does not seem particularly unreasonable given the fact the officers initiated the stop from an unmarked minivan. Even if regarded as unreasonable, we are not persuaded this is more suggestive of the vehicle occupants arming themselves than it is of them getting rid of incriminating evidence, or even of them just being intoxicated or otherwise distracted.

amount of time to stop do not support that Wilkinson may have been armed. While the armed officers may have been outnumbered, any risk in that circumstance was essentially dispelled when the occupants complied with an order to step out of the vehicle with their hands up. *See Maryland v. Wilson*, 519 U.S. 408, 413–14, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Warren*, 2003 UT 36, ¶¶ 24, 27–29, 78 P.3d 590.

¶ 21 Moreover, several facts undercut the possibility that Wilkinson was armed and dangerous. First, Wilkinson and the others were fully cooperative throughout the stop when ordered to place their hands where they could be seen, ordered to step out of the vehicle, and asked to respond to questions about being armed. *See Warren*, 2003 UT 36, ¶ 32 (stating that the suspect's "cooperative behavior," including "his willing compliance with the order to exit [the] vehicle," "weigh[ed] against the reasonableness of the *Terry* frisk"). Second, showing their hands and stepping out of the vehicle mitigated any danger to the officers. *See id.* ¶¶ 24, 27–29 (discussing that an officer is allowed to order the driver and occupants to step out of their vehicle without any reasonable suspicion, and that such an order, if complied with, reduces the dangerousness of the situation by providing for a more easily monitored face-to-face confrontation). Third, Officer Bebe's actions strongly suggest that he was looking for drugs, not weapons. *See generally Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons."). Officer Bebe asked Wilkinson if he was armed, but he did not even remember Wilkinson's response. Officer Bebe testified he believed Wilkinson had methamphetamine on his person, but he did not testify that he believed Wilkinson was armed prior to patting him down. Fourth, the frisk of Wilkinson occurred after a search of the driver had revealed no weapons. Fifth, although Officer Bebe readily identified the vehicle's occupants, he did not say that the occupants were likely to be armed based on Officer Bebe's past experiences with these suspects. *See* 4 Wayne R. LaFave, *Search and Seizure*

§ 9.6(a), at 627–30 (4th ed.2004) (indicating that courts have found a search was justified when there was "awareness that the suspect had previously been armed"). *But see State v. Chapman*, 921 P.2d 446, 453 (Utah 1996) (explaining that a suspect's being armed on another occasion does not automatically justify a search for weapons). Finally, CI gave Officer Bebe detailed information about the people and the drugs involved but never once indicated—or was asked about—the likely presence of weapons in the vehicle or in the possession of the vehicle's occupants.

¶ 22 After objectively reviewing all the evidence and considering the totality of the circumstances, we conclude there was no reasonable suspicion that Wilkinson was armed and dangerous. Therefore, all evidence discovered as a result of the invalid frisk was inadmissible. *See State v. White*, 856 P.2d 656, 657 (Utah Ct.App.1993).

CONCLUSION

¶ 23 Although there was ample reasonable suspicion of criminal activity so as to justify the vehicle's stop, there was no reasonable suspicion that Wilkinson was armed and dangerous. Frisking him was accordingly not justified and violated his Fourth Amendment rights. We reverse the denial of the motion to suppress evidence and remand to the trial court for a new trial or such other proceedings as may now be in order.

¶ 24 WE CONCUR: JAMES Z. DAVIS, Judge and CAROLYN B. McHUGH, Judge.