2003 UT App 101

**STATE of Utah, Plaintiff and Appellee,**

v.

**Robin M. LAFOND, Defendant and Appellant.**

**No. 20010970–CA.**

Court of Appeals of Utah.

April 3, 2003.

---

Happy Morgan, Grand County Public Defender, Moab, and Kristine M. Rogers, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, and Joanne C. Slotnik, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges JACKSON, GREENWOOD, and ORME.

## AMENDED OPINION [1]

ORME, Judge.

¶ 1 Robin M. Lafond appeals her conviction of illegal possession of a controlled substance in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (1998). Lafond contends that because the investigating officer had no reasonable suspicion to justify the frisk and resulting search of her person, the district court erroneously denied her motion to suppress. We agree and reverse.

## BACKGROUND

¶ 2 "Because a determination of the reasonableness of ... police conduct is highly factual in nature, we review the facts in detail." *State v. Trujillo*, 739 P.2d 85, 86

---

1. This Amended Opinion replaces the court's original Opinion in Case No. 20010970–CA, issued February 21, 2003.

(Utah Ct.App.1987). On March 23, 2001, at approximately 9:45 p.m., Utah Highway Patrolman Steve Salis observed a vehicle traveling east on Interstate 70.[2] Officer Salis determined by radar that the car was traveling at the rate of four miles per hour over the speed limit,[3] and as the car passed him he also noticed that the license plate light was not working. Officer Salis conducted a traffic stop, approached the vehicle on the driver's side, and asked the driver for his driver's license, vehicle registration, and proof of insurance. The driver told Officer Salis that he did not have a driver's license but that he did have an identification card. At this time, Lafond, the passenger in the vehicle, interjected that the vehicle was hers and that she was not driving because she was tired.

¶ 3 When Officer Salis asked the driver why he did not have a Utah driver's license, the driver explained that his license was previously suspended for a DUI, and that he was eligible to reapply for a license but had not yet done so. During his questioning of the driver, Officer Salis noticed that the driver was holding a large "refill" cup and that there was a Crown Royal bag on the front seat that appeared to have something in it.[4] Officer Salis then informed the two that he had stopped them for speeding and for a defective license plate light and asked Lafond to produce the vehicle registration.

¶ 4 In response to this request, Lafond looked on the front seat and floorboard, retrieved a small leather coin purse and placed it between her legs, and then began searching through the glove compartment. Officer Salis, who was shining a flashlight in the direction of the glove box, noticed a cup holder on the console containing small green particles that he believed were marijuana.[5] Officer Salis did not detect any odor of alcohol or marijuana, and the driver did not seem impaired.

¶ 5 In the meantime, Lafond had located the registration, which indicated the car was properly registered to her, and handed it to Officer Salis. Officer Salis then asked Lafond to produce proof of insurance, and Lafond resumed her search through the glove box. She was "moving very fast" and seemed nervous to Officer Salis. Officer Salis then asked the subjects if there was anything illegal in the vehicle. Lafond stated that there was not. Officer Salis asked if Lafond had any weapons or alcohol in the vehicle, and Lafond stated she did not. Officer Salis asked Lafond if she had any marijuana in the vehicle, and she said she did not. Officer Salis then asked Lafond if anyone had smoked marijuana in the vehicle lately, and Lafond stated she did not think so, but was not sure, as she had just retrieved the car that morning after loaning it to a friend for about a week.

¶ 6 Officer Salis then obtained permission from Lafond to search the vehicle and asked her to step outside. Before doing so, Lafond

---

**2.** Officer Salis was working a "DUI shift," which, according to the officer, is a "five-hour slot[ ]" where the officer is "specifically looking for impaired drivers." The officer must patrol between 9:00 p.m. and 2:00 a.m. and stop at least ten vehicles.

**3.** Officer Salis testified that he routinely stops vehicles that are traveling four miles per hour over the speed limit, although he was not planning to issue a speeding ticket in this particular instance.

**4.** Crown Royal is a Canadian whiskey. It is typically sold in a distinctive purple velvet bag equipped with gold-colored drawstrings. The Crown Royal bag spotted by Officer Salis was ultimately determined to contain nothing illegal.

**5.** On cross-examination of Officer Salis, Lafond's counsel asked, "Is it your belief today that if we

were to test [the particles] that [they] would turn out to be marijuana?" Officer Salis responded: "I'm not sure. There's just a very small amount. I mean . . . I would not say one way or another if it is or not." Lafond interprets Officer Salis's response as evidence that he was vacillating on whether or not the particles appeared to him to be marijuana. Therefore, Lafond attacks the district court's finding that "[t]here were green particles in the ashtray that the officer thought might be marijuana." We find no merit in this argument. Officer Salis consistently testified that, at the time, he "believed [the particles] were marijuana" and that they "appeared to be marijuana." Whether the particles actually *were* marijuana is a separate question. Because the particles were never tested, it is now impossible to know, and Officer Salis's response that he "would not say one way or another" if the particles actually were marijuana does not detract from his testimony that the particles appeared to be marijuana.

retrieved a pack of cigarettes and the coin purse that she had previously placed between her legs, as well as another small purse from the front seat. With these items, Lafond exited the vehicle. Once outside, Officer Salis instructed Lafond to sit down near the front of the vehicle, and as she was walking to that location, he noticed Lafond put her hands in her front pockets. Lafond was wearing two layers of clothing, including large camouflage pants and a large sweater. He noticed her pockets were bulging and asked Lafond what she had put in her pockets. Lafond denied placing anything in them. Officer Salis then instructed Lafond to remove the bag she had placed in her pocket. Lafond retrieved the purse from her left front pants pocket and placed it on the hood of the car. Officer Salis, noticing the bulge in the right front pants pocket, instructed Lafond to remove the other bag from that pocket. Lafond denied having anything in that pocket and turned away from Officer Salis.

¶ 7 As Officer Salis approached Lafond, reaching for her right pocket, Lafond pulled out the leather coin purse and dropped it on the ground. Officer Salis picked up the purse and asked Lafond what it was. Lafond replied that she "do[es] leather work." Officer Salis interpreted this response and Lafond's behavior as nervous and evasive, although he did not perceive Lafond's demeanor as hostile or threatening. Officer Salis then instructed Lafond to stand and face away from him. Lafond complied, and Officer Salis patted down the exterior of her right front pocket. While doing so, Officer Salis felt what he believed to be a pipe and asked Lafond to remove the object from her pocket. Lafond refused, and Officer Salis put his hand into her pocket and pulled out a small torch, a glass pipe, and a small glass jar containing what was later determined to be methamphetamine. Officer Salis then searched Lafond and made her empty her pockets. Officer Salis told the driver to get

out of the car and searched him as well. Officer Salis then handcuffed the driver and Lafond and conducted a search of the vehicle, which revealed no additional contraband.[6]

¶ 8 Lafond was subsequently arrested and charged with possession of methamphetamine. She pleaded not guilty and moved to suppress the evidence seized by Officer Salis. After the district court denied her motion to suppress, Lafond changed her plea to guilty, reserving the right to appeal from the denial of her motion to suppress. *See generally State v. Sery,* 758 P.2d 935, 939 (Utah Ct. App.1988) (authorizing conditional pleas).

## ISSUES AND STANDARD OF REVIEW

¶ 9 On appeal, Lafond argues that (1) Officer Salis's questions regarding weapons and illegal drugs exceeded the scope of the original traffic stop; (2) Officer Salis searched her absent probable cause or exigent circumstances; and (3) even if Officer Salis's conduct amounted only to a *Terry* frisk for weapons, the frisk was not justified by reasonable suspicion.[7]

¶ 10 "[F]actual findings underlying a trial court's decision to grant or deny a motion to suppress evidence are reviewed under the deferential clearly-erroneous standard[.]" *State v. Moreno,* 910 P.2d 1245, 1247 (Utah Ct.App.1996), *cert. denied,* 916 P.2d 909 (Utah 1996). "[W]hether a particular set of facts gives rise to reasonable suspicion is a question of law, which is reviewed for correctness." *State v. Chapman,* 921 P.2d 446, 450 (Utah 1996). "The legal standard for reasonable suspicion, however, 'is highly fact dependent,' " *id.* (citation omitted), and therefore we accord "a measure of discretion ... to the [district court's] application of the legal standard to the facts." *Moreno,* 910 P.2d at 1247.

## ANALYSIS

¶ 11 "The Fourth Amendment of the United States Constitution guarantees the 'right

---

6. Neither of the bags retrieved from Lafond's pockets contained any contraband, but it is unclear when Officer Salis determined this.

7. Lafond also argues that three of the district court's factual findings are clearly erroneous. We find no merit in these arguments, and in light

of our disposition, we decline to address them further. *See State v. Allen,* 839 P.2d 291, 303 (Utah 1992) ("In accord with the established principles of review applicable to all cases ... [courts need not] analyze and address in writing every issue or claim raised.").

of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *State v. Lopez*, 873 P.2d 1127, 1131 (Utah 1994) (quoting U.S. Const. amend. IV). The parties agree that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendment[ ], even [if] the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). *Accord State v. Patefield*, 927 P.2d 655, 659 (Utah Ct.App.1996) ("[T]here is no question that [defendant] was seized by [the officer's] traffic stop."). However, " 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.' " *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (quoting *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)). *Accord State v. Chapman*, 921 P.2d 446, 450 (Utah 1996).

¶ 12 "[I]n determining whether the seizure and search were 'unreasonable,' " we ask, first, "whether the officer's action was justified at its inception" and, second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1879. *Accord State v. O'Brien*, 959 P.2d 647, 649 (Utah Ct.App.1998). Lafond does not argue that Officer Salis's stop of her vehicle—ostensibly for speeding and an unlighted license plate—was unjustified. *See, e.g., Patefield*, 927 P.2d at 657 (holding that officer's stop for "having a burned-out license plate bulb" was "justified at its inception" under *Terry* ); *State v. Sepulveda*, 842 P.2d 913, 917 (Utah Ct.App.1992) ("A police officer may legally stop a vehicle incident to a traffic offense."). Therefore, we consider only the second prong of *Terry*—whether Officer Salis's questioning and subsequent search of Lafond unconstitutionally exceeded the scope of the original stop.

### I. The Questioning

¶ 13 Lafond argues that given the purpose of the traffic stop, Officer Salis had no basis for asking extraneous questions, including questions about weapons and illegal drugs. Indeed, the law is well settled that "[o]nce a traffic stop is made, the detention 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' " *State v. Lopez*, 873 P.2d 1127, 1132 (Utah 1994) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983)). Furthermore, "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. 1, 17, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968) (quoting *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring)). *Accord State v. Johnson*, 805 P.2d 761, 763 (Utah 1991).

This means that

> an officer conducting a routine traffic stop may request a driver's license and vehicle registration, conduct a computer check, and issue a citation. However, once the driver has produced a valid driver's license and evidence of entitlement to use the vehicle, "he must be allowed to proceed on his way, without being subjected to further delay by police for additional questioning."

Investigative questioning that further detains the driver must be supported by reasonable suspicion of more serious criminal activity. Reasonable suspicion means suspicion based on specific, articulable facts drawn from the totality of the circumstances facing the officer at the time of the stop.

*Lopez*, 873 P.2d at 1132 (quoting *State v. Robinson*, 797 P.2d 431, 435 (Utah Ct.App. 1990)) (other citations omitted).

¶ 14 Moreover, even if "reasonable suspicion of more serious criminal activity does arise, the scope of the stop is still limited. The officers must ' "diligently [pursue] a means of investigation that [is] likely to confirm or dispel their suspicions quickly, during which time it [is] necessary to detain the defendant." ' " *Id.* (quoting *State v. Grovier*, 808 P.2d 133, 136 (Utah Ct.App.1991) (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985))) (alterations in original).

¶ 15 After Officer Salis asked the driver for his license, vehicle registration, and proof of insurance, his suspicions were aroused by the following facts: (1) the driver admitted that his license was previously suspended for a DUI; (2) the driver was holding a large refill cup; (3) there was a purple Crown Royal bag on the front seat that appeared to have something in it; (4) when asked to locate the vehicle registration, Lafond looked on the front seat and floorboard, retrieved a small leather coin purse and placed it on the seat between her legs; and (5) there was a cup holder on the console containing small green particles that looked like marijuana.[8]

¶ 16 We think that these circumstances, taken together, constitute "specific, articulable facts" sufficient to warrant "reasonable suspicion of more serious criminal activity," *id.*, specifically, on-the-road consumption of alcohol and marijuana. In light of this reasonable suspicion, Officer Salis was justified in asking Lafond whether there was anything illegal in the vehicle, whether there was any alcohol or marijuana in the vehicle, and whether anyone had smoked marijuana in the vehicle lately. These questions, in and of themselves, were closely tied to Officer Salis's observations and suspicions and did not unconstitutionally prolong Lafond's detention. *See State v. Schlosser*, 774 P.2d 1132, 1137 (Utah 1989) ("An investigative detention is justified if a police officer has a reasonable and articulable suspicion that the automobile's occupants are 'involved in criminal activity.' ") (quoting *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985)).[9] We therefore turn our attention to whether the subsequent frisk and search of Lafond were constitutionally justified.

## II.  The Search

¶ 17 Lafond argues that Officer Salis searched her without probable cause or exigent circumstances. In the alternative, Lafond contends that even if Officer Salis's conduct amounted only to a *Terry* frisk, the frisk was nevertheless conducted without reasonable suspicion that she was armed and dangerous.

¶ 18 We first determine whether Officer Salis was constitutionally justified in frisking Lafond. The legality of a frisk for weapons, absent probable cause, is governed by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny.[10]

In *Terry*, the Supreme Court established a narrowly drawn exception to the Fourth Amendment requirement that police obtain a warrant for all searches. Where a police officer validly stops an individual for investigatory or other purposes and reasonably

---

8.  We put little stock in the additional facts that Lafond was "moving very fast" and "appeared very nervous." "Mere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity." *State v. Schlosser*, 774 P.2d 1132, 1137 (Utah 1989). *See also State v. Lovegren*, 829 P.2d 155, 158 (Utah Ct.App.1992) ("[N]ervous behavior when confronted by a police officer does not give rise to a reasonable suspicion of criminal activity."); *State v. Godina–Luna*, 826 P.2d 652, 655 (Utah Ct.App.1992) ("The fact that defendants were nervous does not raise a reasonable suspicion of criminal activity."). For example, "turning to the left and to the right, appearing fidgety, bending forward, and turning to look at the officer, do not, without more, show a reasonable possibility that criminal conduct had occurred or was about to occur." *Schlosser*, 774 P.2d at 1138. "When confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited...." *Id.*

9.  The specific question about weapons is on a different footing, as nothing in Officer Salis's observations suggested the presence of firearms.

The State refers us to *United States v. Holt*, 264 F.3d 1215 (10th Cir.2001), in which the court concluded that "an officer conducting a traffic stop may ask the driver about the presence of loaded weapons [even] in the absence of particularized suspicion of the existence of such firearms." *Id.* at 1217. We need not reach this issue. Even assuming the question about weapons was proper and did not unconstitutionally prolong Lafond's detention, the subsequent frisk and search were unconstitutional, necessitating reversal, as explained in section II.

10.  The *Terry* holding has been codified in Utah Code Ann. § 77–7–16 (1999), which states: "A peace officer who has stopped a person temporarily for questioning may frisk the person for a dangerous weapon if he reasonably believes he or any other person is in danger." *Id.* "[This] section must be interpreted to meet the constitutional requirements of *Terry v. Ohio* [.]" *State v. Roybal*, 716 P.2d 291, 292 (Utah 1986).

believes that the individual may be armed and dangerous, the officer may conduct a "frisk" or "pat-down" search of the individual to discover weapons that might be used against him.

*State v. Carter*, 707 P.2d 656, 659 (Utah 1985). While it is not necessary that an officer "actually have been in fear," *id.*, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. *Accord Carter*, 707 P.2d at 659 ("A mere unparticularized suspicion or hunch is not sufficient.").

¶ 19 This court recently explained that "[t]wo basic scenarios may warrant a *Terry* frisk." *State v. Warren*, 2001 UT App 346,- ¶ 15, 37 P.3d 270, *cert. granted*, 2002 Utah LEXIS 152.

> In the first, facts and circumstances unique to the particular suspect and/or factual context may give rise to a reasonable suspicion the suspect may be armed, such as a suspect with a bulge in his clothing that appears to be a weapon or a suspect who is hesitant in denying that he is armed and aggressively approaches the officer immediately upon being stopped. In the second scenario ... the inherent nature of the crime being investigated [may] lead[ ] to the reasonable suspicion that the suspect may be armed.... Crimes that, by their nature, suggest the presence of weapons include: "robbery, burglary, rape, assault with weapons, homicide, and dealing in large quantities of narcotics.... But for other types of crimes, such as trafficking in small quantities of narcotics, possession of marijuana, illegal possession of liquor, ... driving under the influence and lesser traffic offenses ..." there must be particular facts which lead the officer to believe that a suspect is armed.

*Id.* (quoting 4 Wayne R. LaFave, Search and Seizure § 9.5(a), at 255–56 (3d ed.1996)) (citations omitted). *See Carter*, 707 P.2d at 660 ("[A] police officer may lawfully frisk a burglary suspect [because] '[i]t is reasonable ... to believe that a burglar may be armed with weapons ... and that a pat-down search is

necessary for the officer's safety.' ") (citation omitted).

¶ 20 The State does not argue that the frisk of Lafond can be justified under the second scenario, i.e., that the inherent nature of the crimes being investigated in this case—illegal consumption of alcohol and possession of drugs—automatically provides the requisite reasonable suspicion that Lafond was armed and dangerous. *See State v. White*, 856 P.2d 656, 664–66 (Utah Ct.App. 1993) (holding that officer's suspicion of cocaine use did not justify immediate frisk of defendant because that crime is not inherently violent). Rather, the State contends that facts and circumstances unique to Officer Salis's encounter with Lafond gave rise to a reasonable belief that Lafond was armed with weapons that may be used against him. Specifically, the State relies upon the following testimony from Officer Salis:

> Well, she had removed two bags from the vehicle before exiting the vehicle. As she was walking towards me, she had both hands in her pockets. She was wearing two layers of clothes. She was wearing a large pair of camouflage pants over other clothing. She, also, had a large sweater on. And as she's walking towards me, after she removes her hands from her pockets, I could see both of her pockets are bulging, and she's also very nervous and very evasive, [and] doesn't want to come into contact with me.

We have previously held that because nervous behavior, such as "avoidance of eye contact, is consistent with innocent as well as criminal behavior," such conduct "can be afforded no weight in determining a detaining officer's reasonable suspicion of criminal activity." *State v. Robinson*, 797 P.2d 431, 436 (Utah Ct.App.1990). We are likewise reluctant to assign any particular importance to nervous conduct when determining reasonable suspicion in the context of a *Terry* frisk for weapons, at least, as in this case, when the nervousness is unaccompanied by any hostile, threatening, or aggressive behavior. Although "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop," *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 886,

137 L.Ed.2d 41 (1997), it is not difficult to understand why such an experience would make a person nervous.[11]

¶ 21 Absent Lafond's nervous and evasive behavior, the State's justifications, derived from Officer Salis's testimony, essentially boil down to these: (1) Lafond removed two small purses from the vehicle, (2) her pockets were bulging, and (3) she wore baggy, layered clothing. We conclude that these circumstances, taken together, do not constitute "specific and articulable facts" such that "a reasonably prudent man . . . would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 21, 27, 88 S.Ct. at 1880, 1883. Although Officer Salis hypothesized that "there could have been weapons in the bags which [Lafond] removed from the vehicle," we are unpersuaded by such a statement absent additional facts. *See People v. Dickey*, 21 Cal. App.4th 952, 27 Cal.Rptr.2d 44, 46 (1994) (holding officer's testimony that he performed a patdown search because suspect " 'potentially may have been armed' . . . add[ed] nothing" to the reasonable suspicion determination because "[i]n every encounter with a citizen by the police, the citizen may potentially be armed").

¶ 22 Indeed, the facts of record are to the contrary. Officer Salis did not testify that there were any suspicious or distinctive bulges in the bags as he observed them in the car, nor did he testify that the size and/or shape of the bags were consistent with even the possibility that they contained weapons. In fact, Officer Salis's testimony, at least as to one of the bags, suggests the opposite, for he described it as "a small coin purse or cigarette purse." As to the other bag, Officer Salis described it as "a small purse-like . . . or some type of bag." The fact that these bags were pliable enough to be stuffed into Lafond's front pants pockets, as well as the fact that the bags were later determined to be empty, belie any inference that the bags would have looked as though they might well contain weapons.

¶ 23 As to the bulging pockets, they likely should not be viewed as any more suspicious than the bags themselves. Once Lafond had exited the vehicle, Officer Salis instructed her to "remove the bag" from her pocket, which indicates that he watched her transfer the bags from the front seat to her pockets as she moved from the vehicle to a position in front of it, as Officer Salis directed. If these particular pocket bulges were created under Officer Salis's watchful eye, this case is in a much simpler posture than the more common scenario in which an officer encounters a suspect with bulging pockets, the contents of which are completely unknown.

¶ 24 But even if Officer Salis was completely ignorant of the contents of Lafond's pockets, or if the bulges were of a configuration not fully explainable by the bags, he did not testify that the bulges were in any way suspicious or otherwise characteristic of pockets that contained weapons. Wallets, billfolds, keys, handkerchiefs, eyeglass cases, and a host of other common and innocuous items create bulges in pockets. Pockets were made to carry things, and we reject the proposition that an officer may conduct a *Terry* frisk merely because he observes that a pocket has something in it. *See People v. Howard*, 147 A.D.2d 177, 542 N.Y.S.2d 536, 539 (1989) ("This court has frequently held that the mere observation of an undefinable bulge in a person's pocket is insufficient as a basis for a frisk or search . . . [because u]nlike a waistband bulge which is a telltale of a weapon, a pocket bulge could be caused by any number of innocuous objects.") (citations omitted), *appeal dismissed*, 74 N.Y.2d 943, 550 N.Y.S.2d 275, 549 N.E.2d 477 (1989); *Stanley v. Commonwealth*, 16 Va.App. 873, 433 S.E.2d 512, 515 (1993) ("An officer may not, simply by observing some item causing a 'bulge' in one's clothing, conduct a general frisk where the nature of the bulge or the surrounding circumstances do not reasonably support the conclusion that . . . the person is armed and dangerous."). *Cf. People v. Miles*, 196 Cal.App.3d 612, 242 Cal.Rptr. 107, 110 (1987) (holding that officer had reasonable suspicion to conduct patdown search

---

11. We note that in this case, Officer Salis asked Lafond to step out of the vehicle after she consented to a search of her car. Lafond does not

argue that her consent was invalid and, therefore, we do not consider that issue.

when he saw " 'an exaggerated bulge' in defendant's left jacket pocket and that .... [b]ecause of the bulge and the manner in which the jacket swung, the officer 'knew it was some type of heavy object, possibly a gun' "); *People v. May*, 33 Cal.App.3d 888, 109 Cal.Rptr. 396, 397–98 (1973) (holding weapons search was justified when "[d]efendant had a bulge in his right rear pants' pocket," the bulge was consistent with that made by a handgun, and the officer "concluded that ... the object [may be] a handgun"); *Byrd v. United States*, 579 A.2d 725, 729 (D.C.1990) ("[P]olice had reasonable grounds to order [defendant] out of car and to frisk him upon seeing a bulge in [defendant's] pocket that was thought by the police officer possibly to be a gun."); *State v. Schneider*, 389 N.W.2d 604, 604–05 (N.D.1986) (holding *Terry* frisk was justified when officer, while issuing traffic ticket, "noticed a bulge under [defendant's] leather coat that appeared to be a revolver in a shoulder holster"); *Commonwealth v. Wascom*, 236 Pa.Super. 157, 344 A.2d 630, 631–32 (1975) (holding frisk was lawful when "the officer noticed what appeared to be a knife protruding from the [defendant's] coat pocket").

¶ 25 The State does not cite any authority to suggest that an otherwise innocuous-looking pocket bulge may constitute the basis for a *Terry* frisk. For example, in *State v. Carter*, 707 P.2d 656 (Utah 1985), a case relied upon by the State, the Court upheld the legality of a *Terry* frisk based in part on the fact that "the defendant had a large bulge in his front pocket," but more importantly, because the defendant was suspected of being involved in a burglary, which, as we have stated, is one of the crimes that, by its very nature, is likely to involve a weapon. *Id.* at 660. Similarly, in *State v. Rochell*, 850 P.2d 480 (Utah Ct.App.1993), we upheld a *Terry* frisk in part because (1) "[the defendant] had a bulge in his pocket;" (2) "the officer believed the bulge could have been a weapon;" and (3) "when asked whether he had any weapons, [the defendant] 'was hesitant in answering no.' " *Id.* at 483 (footnote omitted). And while we have stated that reasonable suspicion may be generated by "a suspect with a bulge in his clothing *that appears to be a weapon*," *Warren*, 2001 UT App 346 at ¶ 15, 37 P.3d 270 (emphasis added), we have not extended this rationale to include amorphous bulges that are not suspicious or in any other way characteristic of bulges created by weapons. Indeed, such a holding would effectively validate the use of an "unparticularized suspicion or hunch" to justify the physical intrusion of a weapons pat-down, a practice that *Terry* forbids. *Carter*, 707 P.2d at 659.

¶ 26 We are similarly unpersuaded by the State's argument that Lafond's layered clothing contributed to a reasonable suspicion that she was armed. We see nothing particularly unusual about such dress given the fact that the incident occurred in March at approximately ten o'clock in the evening. *See White*, 856 P.2d at 658, 661 (holding that possibility "defendant's heavy coat could be concealing weapons" was insufficient to justify frisk).

¶ 27 Because we hold that Officer Salis had no reasonable suspicion that Lafond was armed and dangerous so as to justify a *Terry* frisk, it necessarily follows that he had no probable cause to justify an outright search of Lafond.[12] Our holding also forecloses the

---

**12.** Lafond argues that Officer Salis's conduct exceeded a frisk and constituted a search from the outset, requiring probable cause and not the lesser reasonable suspicion, because before he effected the pat-down, "he required her to identify and produce the contents of her pockets." Although we resolve this case on the narrower ground that Officer Salis acted without reasonable suspicion that Lafond was armed or dangerous, there is ample authority to support the proposition that requiring a suspect to disclose the contents of his or her pockets constitutes a search requiring probable cause. *See, e.g., United States v. Ward*, 682 F.2d 876, 880 (10th Cir.1982) (characterizing directive to empty pockets as a search); *State v. Ching*, 107 Or.App. 631, 813 P.2d 1081, 1083 (1991) (agreeing with trial court that officer's command that defendant "empty his pockets" was " 'the equivalent of a search by the police' "); 4 Wayne R. LaFave, Search & Seizure § 9.5(b), at 271 (3d ed.1996) (observing that officer in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), exceeded permissible scope of search when he thrust his hand into suspect's pockets and that "[t]he same result would obtain if the officer, in lieu of a pat-down, simply ordered the suspect to empty his pockets"). *Cf. People v. Lipscomb*, 179 A.D.2d 1043, 579 N.Y.S.2d 302, 303 (1992) (Even assuming "that the officers were entitled to conduct a

State's argument that the search of Lafond can be justified under the "plain feel" doctrine. That doctrine requires that the officer is lawfully in a position to feel the contraband, *see Minnesota v. Dickerson,* 508 U.S. 366, 379, 113 S.Ct. 2130, 2139, 124 L.Ed.2d 334 (1993), and, as we have concluded, in this case Officer Salis simply had no right " 'to touch the person questioned.' " *Terry,* 392 U.S. at 11 n. 5, 88 S.Ct. at 1874 n. 5 (citation omitted). *See also Ybarra v. Illinois,* 444 U.S. 85, 93 n. 5, 100 S.Ct. 338, 343 n. 5, 62 L.Ed.2d 238 (1979) ("Since we conclude that the initial patdown of [defendant] was not justified under the Fourth and Fourteenth Amendments, we need not decide whether or not the presence on [defendant's] person of 'a cigarette pack with objects in it' yielded probable cause to believe that [defendant] was carrying any illegal substance.").

## CONCLUSION

¶ 28 Even if Officer Salis's questioning beyond what was necessary for the traffic stop was proper, and even if Lafond's consent to search the vehicle was untainted by any improper prolonging of the detention, the patdown and search of Lafond's person was illegal under the Fourth Amendment. Given the inherent nature of the crimes being investigated, and in the absence of reasonable suspicion suggesting the presence of weapons, there simply was no occasion to frisk Lafond. The district court's denial of the motion to suppress is reversed, and the case is remanded for such further proceedings as may now be appropriate.

¶ 29 WE CONCUR: NORMAN H. JACKSON, Presiding Judge, PAMELA T. GREENWOOD, Judge.

protective frisk, they were not entitled to require defendant to empty his pockets.'").