2003 UT App 266

**STATE of Utah, Plaintiff and Appellee,**

v.

**Matthew L. DESPAIN, Defendant and Appellant.**

No. 20010761–CA.

Court of Appeals of Utah.

July 25, 2003.

Rehearing Denied Aug. 21, 2003.

G. Fred Metos, McCaughey & Metos, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, Jeffrey T. Colemere, Smart Schofield Shorter & Lunceford, and Kirk M. Torgensen, Attorney Generals Office, Salt Lake City, for Appellee.

Before Judges DAVIS, GREENWOOD, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 Defendant Matthew Despain appeals from his conditional guilty plea to operating a clandestine drug laboratory, a second degree felony, in violation of Utah Code Annotated Section 58–37d–4 (Supp.2001). We affirm.

## BACKGROUND

¶ 2 On November 6, 1999, Despain, his wife, and their young son were traveling southbound on SR 40, near Heber, Utah. At about midnight, near the intersection of SR 40 and SR 189, Heber City Police Officer Troy Slaugh noticed that the license plate attached to Despain's fifth wheel trailer was not properly lit. Accordingly, Slaugh called dispatch with the license plate number and learned that the vehicle belonged to Despain. Slaugh immediately recognized that he had had contact with Despain recently and that the previous contact had resulted in Despain being charged with both a narcotics violation and a concealed weapon violation.

¶ 3 Armed with this information, Slaugh initiated a traffic stop of Despain. Despain pulled over and Slaugh parked behind the fifth-wheel trailer. Both Slaugh and his partner, Officer Rusty Olsen, then got out of the patrol car and cautiously approached Despain's vehicle. As the officers neared the bed of Despain's truck, Despain's rottweiler stood up, lunged toward Slaugh and began barking furiously, causing both officers to draw their sidearms and retreat back to the patrol car. Slaugh then yelled for Despain, who at that point had exited his truck, to meet the officers near the patrol car, away from the truck and the dog. Despain, instead, got back into the cab of the truck and closed the door, obscuring his subsequent

actions from the officers' view. Slaugh again yelled to Despain, ordering him to meet the officers by the patrol car. Despain then exited the truck and walked back to the officers.

¶ 4 While he walked, both officers noticed that Despain was dressed in blue jeans and a very loose, baggy shirt that hung down over his hips. When he reached the officers, Slaugh asked for Despain's driver license and registration while Olsen asked Despain if he was carrying any weapons on his person. Despain admitted that he had two knives and began reaching toward his waist. Olsen intervened, grabbing and searching Despain, whereupon he discovered and confiscated two knives. The first knife, a smaller knife with a folding blade, was attached vertically to Despain's belt and was in a secured covered sheath. The second knife, however, was a large heavy knife with a fixed blade, loosely placed in a sheath attached horizontally across Despain's belly unsecured by either a cover or a strap. After a short consultation, Slaugh placed Despain under arrest for possession of a concealed dangerous weapon. The officers then conducted a search of the vehicle incident to the arrest and discovered evidence that Despain intended to produce, or was in the process of producing, methamphetamine.[1]

¶ 5 Following his arrest, the State charged Despain with possession or operating a clandestine drug laboratory, possession or use of a controlled substance by a person with a prior conviction, transportation or possession of items prohibited in a correctional and mental health facility, reckless endangerment, possession of drug paraphernalia, and carrying a concealed dangerous weapon. Despain filed a motion to suppress all evidence discovered as a result of Olsen's question, arguing that the question was not supported by reasonable suspicion. Thus, Despain argues his arrest and the subsequent search of his vehicle incident to the arrest were unconstitutional. On November 15, 2000, the trial court conducted a suppression hearing. The court then denied Despain's motion, following which Despain entered into a plea agreement with the State, pleading guilty to the clandestine drug lab charge. In accepting the plea agreement, pursuant to *State v. Sery*, 758 P.2d 935 (Utah Ct.App.1988), Despain preserved the suppression issue for appeal.

## ANALYSIS

¶ 6 Despain argues that the trial court erred in denying his motion to suppress the evidence discovered as a result of Olsen's question concerning weapons possession. " 'We review the factual findings underlying the trial court's decision to grant or deny a motion to suppress evidence using a clearly erroneous standard.' " *State v. Kohl*, 2000 UT 35, ¶ 9, 999 P.2d 7 (quoting *State v. Pena*, 869 P.2d 932, 939 n. 4 (Utah 1994)). "However, we review the trial court's conclusions of law based on these findings 'for correctness, with a measure of discretion given to the trial judge's application of the legal standard to the facts.' " *Id.* (quoting *State v. Moreno*, 910 P.2d 1245, 1247 (Utah Ct.App.1996)).

¶ 7 "To determine whether a search or a seizure is constitutionally reasonable, we must first determine whether the officer's action was ' "justified at its inception." ' " *State v. Chapman*, 921 P.2d 446, 450 (Utah 1996) (quoting *State v. Lopez*, 873 P.2d 1127, 1132 (Utah 1994) (additional citation omitted)). "If so, we then consider whether the resulting detention was ' "reasonably related in scope to the circumstances that justified the interference in the first place." ' " *Id.* (citations omitted). "[A] traffic stop is justified at its inception when 'the stop is "incident to a traffic violation committed in [an officer's] presence." ' " *State v. Hansen*, 2002 UT 125, ¶ 30, 63 P.3d 650 (alterations in original) (citations omitted). Moreover, "during a traffic stop an officer 'may request a driver's license and vehicle registration, conduct a computer check, and issue a citation.' " *Id.* at ¶ 31 (quoting *Lopez*, 873 P.2d at 1132) (additional citations omitted). " ' "Any further temporary detention for investigative questioning after [fulfilling] the purpose for the initial traffic stop" ' constitutes an illegal seizure, unless an officer has probable cause or a reasonable suspicion of a further illegali-

1. Despain does not challenge the officer's search    of his vehicle and trailer incident to his arrest.

ty." *Id.* (quoting *State v. Godina–Luna,* 826 P.2d 652, 655 (Utah Ct.App.1992) (alteration in original) (additional citations omitted)).

¶ 8 However, " '[w]here a police officer validly stops an individual for investigatory or other purposes *and reasonably believes that the individual may be armed and dangerous,* the officer may conduct a "frisk" or "pat-down" search of the individual, [or question the individual regarding the presence of weapons,] to discover weapons that might be used against him.' " *State v. Warren,* 2001 UT App 346, ¶ 13, 37 P.3d 270 (quoting *State v. Carter,* 707 P.2d 656, 659 (Utah 1985)), *cert. granted,* 2002 Utah LEXIS 152. However, if the *Terry* frisk, which may be limited to the officer simply asking about the presence of weapons, is challenged by the defendant following his arrest, "the State must [support the officer's action by] present[ing] articulable facts that would reasonably lead an objective officer to conclude that the suspect may be armed." *Id.* at ¶ 14 (quoting *Carter,* 707 P.2d at 659).

¶ 9 In the instant case, there is no question, and Despain does not argue otherwise, that the traffic stop was justified at its inception. The license plate on Despain's fifthwheel trailer was not properly illuminated, thus, pursuant to Utah Code Annotated Section 41–6–120(b) (1998), Slaugh and Olsen were justified in stopping Despain to cite him

for the violation. However, it is also clear that Olsen's questioning of Despain concerning weapons possession lies outside the scope of the reason for the initial stop. Therefore, we must determine whether the circumstances that the officers encountered during the stop supported either "a reasonable suspicion of a further illegality" sufficient to justify the question, *Hansen,* 2002 UT 125 at ¶ 31, 63 P.3d 650, or the reasonable belief that Despain was armed and dangerous. *See Warren,* 2001 UT App 346 at ¶ 13, 37 P.3d 270.[2]

¶ 10 Despain argues that the trial court erred in relying upon the prior encounter between Slaugh and Despain to support its decision that Olsen's question was supported by reasonable suspicion. We agree.[3] However, "[i]t is well settled that we may affirm a judgment of a lower court if it is sustainable on any legal ground or theory apparent on the record." *State v. Finlayson,* 2000 UT 10, ¶ 31, 994 P.2d 1243.[4]

¶ 11 In the instant case, the record supports Olsen's actions because the circumstances surrounding the traffic stop support a reasonable belief that Despain was armed and dangerous. " 'Where a police officer validly stops an individual for investigatory or other purposes *and reasonably believes that the individual may be armed and dan-*

---

2. The State urges this court to adopt a rule that would make an officer's inquiry into the presence of weapons reasonable per se regardless of whether the question is supported by other reasonable suspicion. *See United States v. Holt,* 264 F.3d 1215, 1225–26 (10th Cir.2001) (concluding that an officer's questioning of a motorist concerning the presence of a *loaded* weapon does not violate the Fourth Amendment of the United States Constitution. Thus, in the Tenth Circuit, questions concerning loaded weapons are considered to be within the normal course of a traffic stop.). Without addressing the applicability of *Holt* to the instant case, we decline to adopt such a rule because (1) adopting such a position would be contrary to existing supreme court doctrine, *see State v. Hansen,* 2002 UT 125, ¶¶ 30–32, 63 P.3d 650 (highlighting the limited and prescribed behavior allowed by police officers during the temporary detention of a citizen); and (2) our conclusion that Despain's behavior following the stop reasonably led the officers to believe that he was armed and dangerous forecloses any need to adopt the position urged by the State. Accordingly, we limit our analysis to

the traditional confines of police-citizen encounters and reserve our analysis of the State's suggestion for an appropriate case.

3. The trial court relied on the prior contact between Slaugh and Despain to support its decision to deny Despain's motion to suppress. However, Slaugh merely asked Despain for his license and registration, while it was Olsen who asked Despain about weapons. Moreover, Olsen did not know of the prior encounter between Slaugh and Despain and the testimony of Slaugh makes clear that Olsen had no reason to believe anything more than a simple traffic stop was occurring prior to their approaching the truck to complete the traffic stop. Accordingly, because Olsen had no history with Despain and was not aware of Slaugh's history with Despain, the trial court erred in considering the prior encounter as material to the issue.

4. Despain does not challenge the trial court's factual findings; thus, we accept them as drafted by the court.

*gerous,* the officer may conduct a "frisk" or "patdown" search of the individual, [or question the individual regarding the presence of weapons,] to discover weapons that might be used against him.' " *Warren,* 2001 UT App 346 at ¶ 13, 37 P.3d 270 (quoting *Carter,* 707 P.2d at 659. However, if the *Terry* frisk, or the questioning of a citizen about the presence of a weapon, is challenged by the defendant following his arrest, "the State must present articulable facts that would reasonably lead an objective officer to conclude that the suspect may be armed." *Id.* at ¶ 14 (quoting *Carter,* 707 P.2d at 659). The basis for this policy is the recognition that "facts and circumstances unique to the particular suspect and/or factual context may give rise to a reasonable suspicion the suspect may be armed." *Warren,* 2001 UT App 346 at ¶ 15, 37 P.3d 270.

¶ 12 Here, it was well after nightfall when the officers approached Despain's vehicle. Before they reached the cab of the truck, they were accosted by an apparently dangerous dog, prompting both officers to draw their sidearms and retreat to their patrol car where Slaugh noticed for the first time that Despain had dismounted his vehicle. Slaugh then instructed Despain to meet the officers at the patrol car, an instruction which Despain completely ignored. He instead reentered the cab of his truck and closed the door concealing any actions he may have taken within the truck. When Despain finally complied with Slaugh's repeated request to meet the officers at the patrol car he approached them wearing an untucked, overly-large shirt that obscured from the officers' view any object that Despain may have secreted in or around his waistband.

¶ 13 Based on the factual circumstance of this case, we conclude that an objective police officer in Olsen's position would have drawn a similar conclusion—that Despain may in fact be armed and dangerous—and that an objective officer, concerned for his safety and the safety of others, would have asked Despain the same question. *See Warren,* 2001 UT App 346 at ¶ 14, 37 P.3d 270 (quoting *Carter,* 707 P.2d at 659). Thus, we conclude that Olsen's question to Despain was sup-ported by a reasonable suspicion that Despain was armed and dangerous.

## CONCLUSION

¶ 14 Based on Despain's conduct during the traffic stop, it was reasonable for Olsen to believe that Despain was possibly armed and dangerous. Accordingly, we affirm the trial court's denial of Despain's motion to suppress.

¶ 15 I CONCUR: PAMELA T. GREENWOOD, Judge.

DAVIS, Judge (concurring and dissenting):

¶ 16 I concur with the majority's analysis through footnote 3, together with its recital of the law applicable to "frisk" or "patdown" searches or questions about the presence of weapons.

¶ 17 Since we are bound by the record and caselaw respecting Officer Olsen's apparently limited knowledge, and must approach this case accordingly, I cannot agree with the majority's conclusion that Officer Olsen had reasonable, articulable suspicion to inquire whether Despain possessed any weapons. " 'Investigative questioning that further detains the driver must be supported by reasonable suspicion of more serious criminal activity. Reasonable suspicion means suspicion based on specific, articulable facts drawn from the totality of the circumstances facing the officer at the time of the stop.' " *State v. Lafond,* 2003 UT App 101, ¶ 13, 68 P.3d 1043 (citations omitted), *cert. denied,* 72 P.3d 685, 2003 Utah LEXIS 59 (Utah 2003). "The legality of a frisk for weapons[ or a question regarding weapons], absent probable cause, is governed by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and [Utah Code Ann. § 77-7-16 (1999)]." *Lafond,* 2003 UT App 101 at ¶ 18, 68 P.3d 1043 (footnote omitted).

¶ 18 Two basic scenarios warrant a *Terry* frisk for weapons: (1) the "facts and circumstances unique to the particular suspect and/or factual context"; and (2) "the inherent nature of the crime being investigated." *Id.* at ¶ 19 (quotations and citations omitted). Under the first scenario, the "facts and circumstances" that "may give rise to reason-

able suspicion [that a] suspect may be armed" include bulges in clothing or other items appearing to be weapons; or a suspect who denies possessing a weapon, yet aggressively approaches an officer. *Id.* (quotations and citations omitted). Factors that do not amount to reasonable, articulable suspicion include a suspect's wearing of layered, baggy clothing; or mere nervousness not accompanied with aggressive or threatening behavior. *See id.* at ¶¶ 20–21.

¶ 19 Under the second scenario, the types of crimes whose nature "suggest[s] the presence of weapons include: robbery, burglary, rape, assault with weapons, homicide, and dealing in large quantities of narcotics." *Id.* at ¶ 19 (quotations and citations omitted). Lesser traffic offenses do not fit within this category. For lesser traffic offenses we have required "particular facts [to] lead [an] officer to believe that a suspect is armed." *Id.* (quotations and citations omitted).

¶ 20 Neither scenario existed in this case. Officers Slaugh and Olsen stopped Despain because the license plate light on his trailer was not lighted and after they ascertained the trailer was registered to Despain. Officer Slaugh remembered Despain from a prior encounter that resulted in narcotics and concealed weapon charges. Apparently, Officer Slaugh did not communicate this information to Officer Olsen, and Officer Olsen testified that he had no knowledge of Despain's prior encounter with Officer Slaugh. The majority then holds that the following facts establish that Officer Olsen had reasonable, articulable suspicion to ask Despain about weapons: Despain approached the officers "wearing an untucked, overly large shirt that [could have] obscured any object that [he] may have [hidden] in his waistband"; Despain exited the cab of his truck, re-entered the cab, closed the door (thus "completely ignor[ing]" the officers), and then re-exited the cab; the officers encountered "an apparently dangerous dog" in the bed of the truck; and the traffic stop occurred at night.

¶ 21 In my view, these circumstances do not amount to reasonable, articulable suspicion. First, there was no evidence that would indicate that Officer Olsen could reasonably believe that Despain possessed weapons on his body. No evidence was presented that Despain's clothing exhibited bulges or any other indications of weapons that would warrant a question regarding weapons. *See id.* Rather, Officer Olsen could point only to Despain's untucked, overly large shirt that may have obscured any weapon hidden in Despain's waistband. This court has found that "baggy, layered clothing," does not amount to reasonable, articulable suspicion by itself. *Id.* at ¶ 21. Similarly, Officer Olsen's belief that Despain may have tucked away a weapon in his waistband, absent any evidence that would otherwise indicate the presence of a weapon, does not amount to reasonable, articulable suspicion. *See id.* (noting that "officer's testimony that he performed a patdown search because suspect ' "potentially may have been armed" ... add[ed] nothing' to the reasonable suspicion determination because '[i]n every encounter with a citizen by the police, the citizen may potentially be armed.' " (alterations in original) (quoting *People v. Dickey,* 21 Cal. App.4th 952, 27 Cal.Rptr.2d 44, 46 (1994))); *cf. State v. White,* 856 P.2d 656, 661 (Utah Ct.App.1993) (holding that "simply wearing a winter coat" is not a factor that would indicate whether a suspect was armed).

¶ 22 Second, there was no evidence that Despain aggressively approached the officers. *See Lafond,* 2003 UT App 101 at ¶ 20, 68 P.3d 1043. Although Despain re-entered the cab when the officers first ordered him to approach them, he eventually complied and walked toward them. While the majority argues that Despain "completely ignored" the officers' request, this characterization is an overstatement. There is no evidence that indicates how long Despain "ignored" the officers' request to approach. The record does show that Despain exited the cab and approached the officers after the officers' second order. Logic suggests that Despain re-entered the cab of his vehicle to retrieve documentation, particularly when confronted by two police officers with their dangerous weapons drawn.

¶ 23 While it makes sense for the officers to retreat from the "apparently dangerous dog," I fail to see how this creates a reasonable, articulable suspicion that Despain may

have been armed. If anything, the presence of Despain's dangerous dog cuts against the notion that Despain would feel the need to carry weapons.

¶ 24 Finally, the majority factors the nighttime traffic stop into its reasonable, articulable suspicion analysis. I fail to see how a nighttime traffic stop creates a reasonable, articulable suspicion that an individual may be armed. Individuals may be armed day or night. Our law requires officers to point to "specific, articulable facts" regarding the suspect to allow an officer to conduct a *Terry* frisk or to question a suspect for weapons. *Id.* at ¶ 13 (quotations and citations omitted). The time of day of a police encounter adds nothing relevant to the reasonable, articulable suspicion analysis.

¶ 25 Based on the foregoing, I dissent from the majority's conclusion that Officer Olsen had reasonable, articulable suspicion to inquire whether Despain had any weapons.