2006 UT App 244

**LAYTON CITY, Plaintiff and Appellee,**

v.

**Michael W. OLIVER, Defendant and Appellant.**

**No. 20050498–CA.**

Court of Appeals of Utah.

June 15, 2006.

---

D. Bruce Oliver, Salt Lake City, for Appellant.

Kristina M. Neal, Layton City Prosecutor, Layton, for Appellee.

Before GREENWOOD, Associate P.J., BILLINGS, and McHUGH, JJ.

## OPINION

McHUGH, Judge:

¶1 Michael W. Oliver appeals the trial court's denial of his motion to suppress. Because we conclude that the nearly three-and-a-half-hour detention of Oliver was unreasonable, we reverse.

## BACKGROUND

¶2 At approximately 4:15 a.m. on December 1, 2002, Officer Brent Erickson of the Layton City Police Department was on patrol in his vehicle. Erickson observed a vehicle parked in a remote, undeveloped area of a subdivision. It was a cold morning, approximately twenty degrees Fahrenheit, but Erickson observed that the vehicle's windows were not frosted over and found that the hood was warm to the touch. Erickson also observed a purse, a child's car seat, and a stroller in the vehicle. Because of these items, Erickson believed that the vehicle belonged to a woman and was concerned that she might be in trouble. Erickson spent the next few minutes driving around the area to see if he could find anyone.

¶3 After an unsuccessful search, Erickson returned to a location where he could still observe the car and turned off all of the lights on his vehicle. Approximately five minutes later, Erickson saw an individual emerge from the area of a nearby model home, approach the vehicle Erickson was observing, get inside, and drive away. After following the vehicle for a short distance, Erickson noticed that one of its brake lights was not working properly and, as a result, initiated a traffic stop.

¶4 After making the stop, Erickson asked the driver for his license, registration, and proof of insurance. From these documents, Erickson was able to determine that the driver was Oliver. Erickson asked Oliver what he was doing in such a remote location

at such an early hour. In response, Oliver told Erickson that he had been visiting a friend, Brian Bird, and that he had just left Bird's house after being there for approximately an hour and a half. When Erickson asked Oliver for the address or phone number for Bird's residence, Oliver indicated that he did not have either, but did give Erickson the general location of Bird's house. Given the location of Bird's residence relative to where Oliver's car was previously parked, Erickson then asked Oliver why he had parked so far away from Bird's residence. Oliver told Erickson that he had walked through a field to get to the house because Bird's mother, who also lived in the house, did not like late-night visitors.

¶ 5 While talking to Oliver, Erickson noticed a clean, yet wet pair of latex gloves on the driver-side floorboard. When Erickson asked Oliver about the gloves, Oliver indicated that he used them to avoid getting his hands dirty when he worked on his car. At some point, Oliver caused his shoes, which were wet and muddy from walking across the field, to come in contact with the gloves. Because of Erickson's initial observation of the gloves, he asked Oliver why they had been clean if they were, as Oliver had indicated, used while Oliver worked on his car. In response, Oliver told Erickson that the gloves were wet and dirty because he had touched them with his shoes.

¶ 6 Erickson then returned to his patrol car to verify the validity of Oliver's license and vehicle registration, as well as to run a warrants check. While in his vehicle, Erickson obtained a phone number for Bird's residence. Erickson called that number and spoke with an individual who identified himself as Bird's father. Bird's father indicated that Bird had left the house at approximately 10:00 p.m. and that he had not seen Bird return.

¶ 7 Erickson returned to Oliver's vehicle and asked Oliver to step out of it. Erickson asked Oliver if he had any weapons on his person, to which Oliver replied that he did not. Erickson patted Oliver down, finding nothing. Erickson then asked Oliver whether there was anything in the vehicle that did

not belong to him, and Oliver replied that his wife's purse was in the car. Erickson asked Oliver if he could search the car, and Oliver responded in the negative. At that point, Erickson detained Oliver and left him with another officer who had arrived on the scene, Officer Andy Fresh. At some point during Oliver's interaction with Erickson and Fresh, he indicated that he had four prior burglary convictions.

¶ 8 After leaving Oliver with Fresh, Erickson searched the model home that Oliver had walked past to see if there were any signs of forced entry. When he discovered none, Erickson then drove to an area just west of a nearby church. Erickson later testified that there had been vehicle burglaries in that area in the past. When he found no signs of vehicle burglaries, Erickson began to drive back to the scene of the traffic stop. As he entered the parking lot of the nearby church, the lights of his vehicle passed across a fence that separated the church parking lot from a nearby subdivision, revealing a section of the fence that had been cut. The cut in the six-foot fence began at the bottom and spanned approximately three-fourths of the way up the fence.[1] Once he saw the cut in the fence, Erickson turned his attention toward the church. As Erickson inspected the church, he found an open window and a window screen removed from its proper location. Erickson then arranged for a caretaker of the church to open the building. Upon inspection, Erickson learned that nothing was missing from the church.

¶ 9 With the information he had gathered, Erickson decided to pursue a warrant to search Oliver's vehicle. Erickson prepared an affidavit in support of a warrant that contained the information about his initial observation of Oliver's vehicle, the traffic stop, his investigation of the area, and Oliver's prior burglary convictions. The affidavit was presented to a magistrate, who issued a warrant authorizing Erickson to search Oliver's vehicle. According to a facsimile machine time and date stamp on the search warrant, the warrant was transmitted at approximately 7:45 a.m. on December 1, 2002,

1. The record indicates that it was later discover- ed that the fence had been cut for some time.

nearly three hours and thirty minutes after the initial traffic stop of Oliver.

¶ 10 Based on the traffic stop and evidence seized in the search of Oliver's vehicle, he was charged with possession of drug paraphernalia.[2] Oliver filed a motion to suppress, which the trial court denied. Thereafter, Oliver entered a conditional no contest plea, specifically reserving the right to appeal the denial of his motion to suppress. *See State v. Sery*, 758 P.2d 935, 937–40 (Utah Ct.App. 1988). Oliver appeals.

## ISSUE AND STANDARD OF REVIEW

■ ¶ 11 Oliver argues that the trial court erred by denying his motion to suppress. We review the trial court's ruling on a motion to suppress for correctness, without deference to the trial court's application of the law to the facts. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699.

## ANALYSIS

■ ¶ 12 Oliver asserts that his detention violated the Fourth Amendment because Officer Erickson lacked reasonable, articulable suspicion to lawfully detain him for three and a half hours. Layton City responds that the lengthy detention was justified because the officers reasonably suspected that a crime had been or was about to be committed. We agree with Oliver that the three-and-a-half-

hour detention was outside the bounds of constitutional reasonableness.[3]

■ ¶ 13 The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. " '[S]topping an automobile and detaining its occupants constitute a "seizure" within the meaning of the Fourth Amendment.' " [4] *State v. Lafond*, 2003 UT App 101, ¶ 11, 68 P.3d 1043 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). The Constitution does not forbid all searches and seizures, only unreasonable ones. *See id.* (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ ¶ 14 The constitutionality of a search and seizure is determined by answering two questions: "(1) Was the police officer's action justified at its inception? and (2) Was the resulting detention reasonably related in scope to the circumstances that justified the interference in the first place?" *State v. Lopez*, 873 P.2d 1127, 1131–32 (Utah 1994) (quotations and citation omitted). Here, Oliver does not challenge the initial stop but rather the subsequent detention.[5] We therefore move directly to examining the second prong.

---

2. Oliver was also charged with a traffic violation for the improper functioning of the brake light on his vehicle, but this charge was later dismissed on Layton City's motion.

3. Oliver also argues on appeal that the affidavit in support of the search warrant was not supported by articulable facts necessary to find the existence of probable cause. Because we determine that the detention was illegal and, consequently, the motion to suppress should have been granted, we need not address this issue. We note, however, that although the affidavit may have been tainted because it contained information discovered during the unreasonable detention, there was nothing on the face of the affidavit that would have alerted the magistrate who authorized the search warrant to that fact.

4. Under our case law, there are three permissible levels of police stops:

(1) An officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will; (2) an officer

may seize a person if the officer has an articulable suspicion that the person has committed or is about to commit a crime ...; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense had been committed or is being committed.

*State v. Markland*, 2005 UT 26, ¶ 10 n. 1, 112 P.3d 507 (quotations and citation omitted). The stop in this case was a level two seizure because it was an "investigatory detention requiring reasonable suspicion of wrongdoing." *State v. Chism*, 2005 UT App 41, ¶ 11, 107 P.3d 706.

5. Because the initial stop was based on a traffic violation—specifically, a non-functioning brake light—it was justified at its inception. *See State v. Lopez*, 873 P.2d 1127, 1132 (Utah 1994) ("An observed traffic violation gives the officer at the least, probable cause to believe the citizen had committed a traffic offense." (quotations and citations omitted)); *State v. Sepulveda*, 842 P.2d 913, 917 (Utah Ct.App.1992) ("A police officer may legally stop a vehicle incident to a traffic offense." (citations omitted)).

¶ 15 It is well settled that "once a traffic stop is made, the detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Lafond*, 2003 UT App 101 at ¶ 13, 68 P.3d 1043 (quotations and citations omitted). Moreover, the scope of the search must be "strictly tied to and justified by the circumstances which rendered its initiation permissible." *Id.* (quotations and citations omitted). Investigative detentions that detain the driver past a license and registration check must be supported by reasonable suspicion of more serious criminal activity. *See id.* "Reasonable suspicion means suspicion based on specific, articulable facts drawn from the totality of the circumstances facing the officer at the time of the stop." *Id.* Importantly, even if reasonable suspicion arises, the scope of the stop is still limited, *see id.*, and officers must "diligently pursue[ ] a means of investigation that [is] likely to confirm or dispel their suspicions quickly, during which time it [is] necessary to detain the defendant," *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

¶ 16 This court, following the lead of the United States Supreme Court, has declined to adopt a bright-line rule as to an accepted length of a detention.[6] *See State v. Ottesen*, 920 P.2d 183, 185 (Utah Ct.App.1996); *State v. Grovier*, 808 P.2d 133, 136 (Utah Ct.App. 1991). Rather, "common sense and ordinary human experience must govern over rigid criteria." *Grovier*, 808 P.2d at 136 (quotations and citations omitted). Nonetheless, the United States Supreme Court, the Utah Supreme Court, and this court have treated the length of an investigatory detention as a significant factor in determining its reasonableness.

¶ 17 In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the United States Supreme Court considered whether a defendant was illegally detained when he was held for ninety minutes at LaGuardia Airport in New York City while his baggage was taken to Kennedy Airport, also in New York City, to be sniffed by drug-detection dogs. *See id.* at 698–99, 103 S.Ct. 2637. The Court concluded that "[t]he length of the detention of respondent's luggage alone preclude[d] the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709, 103 S.Ct. 2637. The Court stated that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Id.* The Court noted "we have never approved a seizure of the person for the prolonged 90–minute period involved here and [could not] do so on the facts presented by this case." *Id.* at 709–10, 103 S.Ct. 2637. *Cf. State v. Markland*, 2005 UT 26, ¶ 34, 112 P.3d 507 (holding that warrants check was within permissible scope of detention because, among other considerations, it lasted only five minutes); *Lopez*, 873 P.2d at 1133 (holding that warrants check was permissible after examining license and registration as long as it did not "significantly extend the *period* of the detention" (emphasis added) (citations omitted)); *Ottesen*, 920 P.2d at 185–86 (holding that defendant was not unreasonably detained because, among other considerations, a backup officer arrived to perform sobriety tests within twenty to twenty-five minutes of initial stop).

¶ 18 In this case, the fact that Oliver was detained for three and a half hours weighs heavily in favor of reversal. Indeed, such a lengthy detention is exceedingly rare, *see* 4 Wayne R. LaFave, *Search and Seizure* § 9.2(f), at 60 n. 168 (3d ed.1996) (citing study concluding that one-half of suspects were detained for less than ten minutes, three-fourths for less than twenty minutes, and more than nine-tenths for less than forty minutes), and is far longer than most investigative detentions challenged on appeal, *see id.* at 59 n. 166 (compiling cases in which appellants challenged detentions ranging from five to forty-five minutes).

¶ 19 Yet even if we set aside the extraordinary length of the detention and focus on the

---

**6.** Specifically, the United States Supreme Court rejected the twenty-minute limit on investigatory detentions promulgated by the American Law Institute. *See* Model Code of Pre–Arraignment Procedure § 110.2(1) (1975); *see also United States v. Place*, 462 U.S. 696, 709–10 n. 10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

means employed by the police officers in this case, *see Grovier,* 808 P.2d at 136 (noting that primary focus should be on means used by law enforcement), the detention was illegal. Assuming reasonable suspicion arose through facts such as the late hour, the location, Oliver's story about whom he was visiting, his revelation about prior burglary convictions, and the latex gloves observed in the vehicle, the officers nonetheless did not "diligently pursue[ ] a means of investigation that was likely to confirm or dispel their suspicions quickly." *Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568. Officer Erickson detained Oliver while he first searched a nearby model home, then drove to an area where vehicle burglaries had occurred, and finally investigated a church. At none of these locations did he find evidence specifically connected to Oliver. Long before three and a half hours had passed, the police officers should have determined that the stop of Oliver could "no longer be justified as an investigative stop," *id.* at 685, 105 S.Ct. 1568, and either released or arrested him. The fact that Erickson continued searching for several hours without arresting Oliver suggests that no probable cause existed for arrest.

¶ 20 The detention here was also illegal because it was not necessary to detain Oliver while Officer Erickson conducted his investigation. *See id.* at 686, 105 S.Ct. 1568. In examining the reasonableness of a detention, "it must be asked whether ... it is rather essential to the investigation that the suspect's presence be continued during that interval." LaFave, *supra,* at 65–66 (footnotes omitted). This depends on considerations such as the "seriousness of the offense being investigated and whether the police are inching closer to having probable cause for arrest." *Id.* at 66–67 (footnotes omitted); *see also Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568 ("A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing."). Here, the officers did not have evidence that Oliver had even committed a crime, much less a serious crime that presented a developing situation or an immediate threat of danger to the public. Moreover, because they knew Oli-

ver's identity and home address, nothing prevented the officers from releasing Oliver while they conducted their investigation into possible burglaries. Oliver need not have remained while Erickson scoured the neighborhood for anything that might suggest wrongdoing.

## CONCLUSION

¶ 21 The trial court erred by denying Oliver's motion to suppress. The detention in this case was unreasonable because of its lengthy duration and because the police officers did not act with proper diligence. We therefore reverse.

¶ 22 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge and JUDITH M. BILLINGS, Judge.