IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | MEMORANDUM DECISION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20100885-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (June 14, 2012) |
| Todd Jeremy Little, | ) | |
| | ) | 2012 UT App 168 |
| Defendant and Appellant. | ) | |

-----

Second District, Ogden Department, 081900371
The Honorable Scott M. Hadley

Attorneys: Jeremy M. Delicino and Elizabeth A. Lorenzo, Salt Lake City, for
Appellant
Mark L. Shurtleff and Marian Decker, Salt Lake City, for Appellee

-----

Before Judges Davis, Thorne, and Christiansen.

DAVIS, Judge:

¶1    Todd Jeremy Little appeals his convictions of possession of a controlled
substance, a third degree felony, *see* Utah Code Ann. § 58-37-8(2)(a)(i), (b)(ii) (Supp.
2011), and possession of drug paraphernalia, a class B misdemeanor, *see id*. § 58-37a-
5(1), arguing that the trial court erred in denying his motion to suppress.  We affirm.

¶2    On December 29, 2007, several officers were called to investigate two men
suspected of shoplifting at a Target store in Riverdale, Utah.  The store's loss prevention
agent described the men to the officers and also identified a woman he believed "was
possibly associated with" them.  Officer Casey Warren positioned himself outside the

store's south exit, where he encountered Little as he exited through the south doors. Officer Warren asked for and was given permission to frisk Little, but he found no weapons or stolen merchandise on Little's person. Officer Warren and Little then walked together to the north doors where Officer Brandon Peterson had encountered Little's friend (Friend) as he exited the store. The officers questioned Little and Friend about what they were doing at the store. Little gave inconsistent answers to the officers about how he arrived at the store, alternately telling them that "his girlfriend brought him to the store" and that he arrived on "a bus." Meanwhile, a third officer had approached Little and Friend's female companion, who turned out to be Little's mother (Mother), inside the store. She informed the officer that Little had driven his truck to meet her at the store and described the truck as a "white '93 Toyota pickup." Mother also told the officers that it did not "surprise her at all" that Little "may be involved with theft because trouble is his middle name."

¶3    Approximately twenty minutes after first encountering Little, the officers decided that they "didn't have enough probable cause or any evidence to believe that [Little and Friend] committed a theft," so they told Little and Friend that they were free to go. Friend left immediately, but Little stayed and continued to talk to the officers. Because the officers continued to harbor suspicions that Little or Friend may have taken stolen merchandise out to the truck before the officers arrived, the officers continued to look for the truck after they told Little and Friend that they could leave. The officers ultimately discovered the truck and observed marijuana and a pipe inside the truck in plain view, whereupon they arrested Little. Little attempted to suppress the marijuana evidence on the ground that he was illegally detained, but the trial court denied the motion. Little was ultimately convicted of possession of a controlled substance and possession of drug paraphernalia.

I. The Officers' Detention of Little Was Both Justified at Its Inception and Appropriately Limited in Scope and Duration.

¶4    In reviewing the trial court's ruling on Little's motion to suppress, we give no deference to the trial court's "application of law to the underlying factual findings." *State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699. "[I]t is settled law that a police officer may detain and question an individual when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *State v. Markland*, 2005 UT 26, ¶ 10, 112 P.3d 507 (internal quotation marks omitted). Such a

detention must be "justified at its inception" and be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Furthermore, officers must "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

¶5 In this case, the officers had received a report from the loss prevention agent that Little and Friend had been "wandering in and out of the store, acting suspiciously." The loss prevention agent told the officers that Friend had been "standing at the end of an aisle watching the activity of others" while Little "reach[ed] behind a display television and did something which scrambled the picture on the television." The loss prevention agent told the officers "that this conduct was consistent with shoplifters, as he believed [Friend] acted as a lookout while [Little] shoplifted." However, the loss prevention agent did not observe Little or Friend actually take anything. Viewed in their totality, these circumstances were sufficient to support the officers' reasonable suspicion that Little and Friend were engaged in criminal activity. *Cf. Terry*, 392 U.S. at 5-7, 30 (determining that an officer had reasonable suspicion to detain three men and search them for weapons because he suspected that their suspicious behavior of walking back and forth past a store window a number of times and then conferring at the end of the street was indicative of criminal activity). Furthermore, the officers developed additional reasonable suspicion upon hearing the inconsistent stories told by Little and Mother about how he had arrived at the store.

¶6 Nevertheless, Little argues that the officers' reasonable suspicion was dispelled when they frisked Little and Friend for weapons and found no store merchandise. Had the officers let Little go at that point, they would not have discovered the existence of Little's truck and would not have gone looking for it. Thus, Little contends that the discovery of the truck was the result of his illegal detention and that the contraband discovered inside should therefore be suppressed. Had Little and Friend remained in the store during the entire time they were observed by the theft prevention agent, we might be inclined to agree with Little. However, the theft prevention agent had informed the officers that Little and Friend had been "wandering in and out of the store," and the officers suspected that they might have already taken something out of the store and put it somewhere else. Furthermore, the loss prevention agent had informed the officers that there was a third person with Little and Friend at the store. Thus, it was within the scope of the officers' reasonable investigation to continue

questioning the suspects to determine whether any stolen merchandise might have been taken to another location, such as a vehicle, and to look for Mother, who may have been an accomplice. *Cf. State v. Beach*, 2002 UT App 160, ¶¶ 11-12, 47 P.3d 932 (upholding a twenty-two minute detention of a defendant and rejecting the defendant's argument that an officer violated his Fourth Amendment rights by continuing to detain him after he gave "an innocent explanation for his actions," explaining that the officer "was not bound to accept Defendant's first explanation as truthful, particularly when he observed other suspicious actions by Defendant," and that the continued questioning was within the scope of the officer's reasonable suspicion); *City of St. George v. Carter*, 945 P.2d 165, 170 (Utah Ct. App. 1997) (determining that where an officer's suspicion that the defendant had been drinking was neither confirmed nor dispelled by questioning the defendant and conducting a warrants check, the officer was justified in having the defendant "leave his food in the vehicle and step out onto the street for observation"). We also do not consider the length of the detention—twenty minutes—to have been unreasonable under the circumstances, particularly given that the officers had to locate and question three different suspects in the course of their investigation. *See State v. Levin*, 2004 UT App 396, ¶ 17, 101 P.3d 846 ("[I]nvestigative stops involving several suspects must be afforded additional time."), *rev'd on other grounds*, 2006 UT 50, 144 P.3d 1096.

## II. The Officers' Detention of Little De-escalated to a Level One Encounter when They Told Him He Was Free to Leave.

¶7      We also agree with the trial court that the detention de-escalated to a level one encounter once the officers told Little that he was free to go.[1] *See generally State v.*

---

[1]In light of the inconsistencies between Little's and Mother's accounts of Little's arrival at the store, coupled with the fact that Friend was seen wandering in and out of the store, we think the officers had reasonable suspicion that there might be stolen merchandise in the truck and that it would have been within the proper scope of the officers' investigation to detain Little while they looked for his vehicle regardless of whether the detention de-escalated to a consensual encounter. However, we cannot determine whether such a detention, if it occurred, was properly limited in duration because it is unclear from the record how long Little remained at the store after he was informed that he was free to leave. *See generally Florida v. Royer*, 460 U.S. 491, 500 (1983)

(continued...)

*Hansen*, 2002 UT 125, ¶¶ 34-35, 63 P.3d 650 (defining a "level one" encounter as "a consensual encounter wherein a citizen voluntarily responds to non-coercive questioning by an officer" and a "level two encounter" as "an investigative detention that is usually characterized as brief and non-intrusive"). Little asserts that "a reasonable person would [not] have felt free to leave when two officers [were] searching the parking lot for his car while one of the officers [was] standing right beside him." He argues that although he "may have been able to leave on foot, . . . the reality [is] that virtually all people who drive to a store also drive away from that store." But the fact that Little did not feel free to leave in his car because the officers were looking for it is not determinative of whether a reasonable person would have felt free to leave at all. In fact, Friend did leave on foot, and we see no reason Little could not have done the same. We are convinced that a reasonable person, having been explicitly told that he was free to go and having seen his companion actually leave without being stopped by police, would have believed that he was in fact free to leave. Furthermore, the information that led to the discovery of the vehicle was obtained prior to the officers' telling Little that he was free to go, during the officers' lawful detention of Little. Thus, even if we determined that the portion of the encounter occurring after Little was told he was free to leave was nonconsensual and illegal, we could not say that the discovery of the vehicle was the fruit of that continued detention.[2] We acknowledge that this left Little in an unfortunate catch-22—if he stayed, the officers would ultimately discover the car; if he attempted to leave in the car, he would lead the officers to it; and if he left on foot, the officers would eventually find the car and arrest him later. However, this situation resulted from information the officers legally obtained in the course of the lawful

---

[1](...continued)
(explaining that an investigative detention must be "sufficiently limited in scope *and duration*" (emphasis added)). Thus, we continue with an analysis of whether the detention de-escalated to a consensual encounter.

[2]Little also argues that even if the encounter ultimately became consensual, the consent was not sufficiently attenuated from the prior detention to be lawful. However, because we determine that the prior detention was itself lawful, we need not address Little's argument further. *See State v. Shoulderblade*, 905 P.2d 289, 292 (Utah 1995) (per curiam) (explaining that the attenuation analysis is employed "when a consensual search [or seizure] is preceded by a Fourth Amendment violation").

investigatory detention, and the officers were not required to cease all investigation simply because they determined they could no longer legally detain Little.

### III. We Decline to Adopt a Bright-Line Rule Limiting the Length of Investigatory Detentions Under the Utah Constitution.

¶8     Little next argues that article I, section 14 of the Utah Constitution should be interpreted as providing greater protection in search and seizure cases than that afforded by the Fourth Amendment to the United States Constitution. *Compare* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."), *with* Utah Const. art. I, § 14 (containing language nearly identical to the Fourth Amendment to the United States Constitution). Specifically, Little requests that we adopt a bright-line test with an "outer limit of 20 minutes" for permissible level two investigative detentions. *See generally* American Law Institute, Model Code of Pre-Arraignment Procedure § 110.2(1) (1975) (proposing a maximum length of twenty minutes for investigative detentions). This issue "presents a question of law, which we review for correctness." *State v. Jackson*, 937 P.2d 545, 547 (Utah Ct. App. 1997).

¶9     We look to this court's discussion in *State v. Jackson*, 937 P.2d 545 (Utah Ct. App. 1997), as a guide in approaching a state constitutional analysis of article I, section 14. The panel in that case pointed out several considerations that are useful in our analysis here: First, a historical argument for increased protection against searches and seizures, such as Little makes here, must show a "logical link between the unique experience of [early Utah settlers] and contemporary society's notions" about the particular context of the search or seizure at issue. *See id.* at 549. Second, the workability of a federal rule on the subject and whether it has a tendency to give rise to "confusion" and "inconsistent interpretations" among courts has been the primary concern of the Utah Supreme Court in determining whether a different interpretation under our state constitution is warranted. *See id.* Third, "as an intermediate court of appeals, we [sh]ould be reluctant . . . to become overly creative in fashioning a state constitutional rule different from the federal rule" because "[s]uch a task lies more appropriately with the Utah Supreme Court as 'the ultimate and final arbiter of the meaning of the provisions in the Utah Declaration of Rights and the primary protector of individual liberties.'" *See id.* at 550

(quoting *State v. Anderson*, 910 P.2d 1229, 1240 (Utah 1996) (Stewart, J., concurring in the result)).

¶10   Here, we struggle to find a logical link between the experiences of Utah's early settlers—warrantless raids of their homes—and the type of investigative detention at issue in this case. *Cf. id.* at 548-49 (rejecting a defendant's historical argument for recognition of a "reasonable expectation of privacy in one's garbage set out for collection on the street" under the Utah Constitution, and noting that "the drafters of article I, section 14 were sensitive to the more specific and intrusive practice of nighttime raids by law enforcement officials, rather than to law enforcement's basic search and seizure power," and that such experiences would not logically have led the framers to necessarily support heightened protection for the privacy of the contents of citizens' garbage cans (citation omitted)). Additionally, we are not convinced that the bright-line rule suggested by Little would be more workable than the federal rule. With respect to investigative detentions, "[t]his court, following the lead of the United States Supreme Court, has declined to adopt a bright-line rule as to an accepted length of detention." *Layton City v. Oliver*, 2006 UT App 244, ¶ 16, 139 P.3d 281; *see also United States v. Place*, 462 U.S. 696, 709-10 & n.10 (1983) (declining to adopt the Model Code of Pre-Arraignment Procedure's suggested twenty-minute time limit). While a bright-line rule may be easier to apply, in the context of search and seizure cases the United States Supreme Court and Utah courts have frequently explained that "common sense and ordinary human experience must govern over rigid criteria." *See United States v. Sharpe*, 470 U.S. 675, 685 (1985); *accord State v. Warren*, 2003 UT 36, ¶ 31, 78 P.3d 590 ("Courts consistently eschew bright-line rules [in the Fourth Amendment context] and instead emphasiz[e] the fact-specific nature of the reasonableness inquiry." (second alteration in original) (internal quotation marks omitted)); *Oliver*, 2006 UT App 244, ¶ 16; *State v. Ottesen*, 920 P.2d 183, 185 (Utah Ct. App. 1996). In light of these considerations, coupled with the limitations of our role as an intermediate court, we decline to adopt the narrow interpretation of the Utah Constitution's search and seizure provision that Little has suggested.

¶11   We determine that the officers' detention of Little was supported by reasonable suspicion and did not exceed that permitted by the Fourth Amendment to the United States Constitution. Furthermore, we agree with the trial court that the detention de-escalated to a level one consensual encounter when the officers told Little that he was free to go. Finally, we decline Little's invitation to adopt a bright-line rule regarding the

permissible length of investigative detentions under article I, section 14 of the Utah Constitution. Accordingly, we affirm Little's convictions.

_____
James Z. Davis, Judge

-----

¶12     WE CONCUR:

_____
William A. Thorne Jr., Judge

_____
Michele M. Christiansen, Judge